**Phillip J. HOWARTH, Appellant,**

v.

**FIRST NATIONAL BANK OF ANCHORAGE, Appellee.**

No. 3762.

Supreme Court of Alaska.

June 29, 1979.

Judith J. Bazeley and Mark A. Sandberg of Merdes, Schaible, Staley & DeLisio, Anchorage, for appellant.

John R. Beard, Anchorage, for appellee.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

## OPINION

RABINOWITZ, Justice.

This is the third time this case has come before us for consideration of appellant Ho-

warth's claim for damages arising out of the breach of an oral contract by the First National Bank of Anchorage. According to Howarth, the contract obligated the bank to bear responsibility for seeing that insurance was procured for certain property which Howarth had contracted to sell to a third party, Progressive Enterprises, Inc. Howarth had executed an assignment to the bank of "all of his right, title, and interest in, and all moneys now due or to become due to him" from the sale.[1] The property was damaged severely by fire on September 10, 1961, and Howarth subsequently learned that it was not insured.[2] In our first decision on the matter, we reversed the superior court's grant of summary judgment in favor of the bank, finding that the question of whether an oral contract had been formed involved a factual dispute precluding summary judgment.[3] This decision was affirmed on rehearing by this court.[4]

At the trial which followed, Howarth testified as to his conversation with a bank officer, Mr. Jack Linton, regarding the terms of the assignment and the alleged oral agreement concerning insurance of the property. At the close of Howarth's testimony, the bank moved for a directed verdict. In its decision on the motion, the trial court noted that although Howarth believed there was a meeting of the minds as to the bank's obligations, the written assignment required the assignor, Howarth, to continue to perform all conditions and covenants of the real estate sale contract.[5] The motion for directed verdict was granted and judg-

---

1. The facts of the transaction are set out more fully in *Howarth v. First Nat'l Bank of Anchorage*, 540 P.2d 486 (Alaska 1975).

2. After the fire, the purchaser of the property made one or two payments on the sale contract to the bank in accordance with the terms of the assignment. On November 18, 1961, fearing that someone might be injured in the fire gutted structure, Howarth gave the purchaser notice of default and election to terminate the transaction, and he subsequently reclaimed the property.

3. *Howarth v. First Nat'l Bank of Anchorage*, 540 P.2d 486 (Alaska 1975).

4. *Howarth v. First Nat'l Bank of Anchorage*, 551 P.2d 934 (Alaska 1976) (Boochever, C. J., and Rabinowitz, J., dissenting).

5. The assignment required, in pertinent part: "Despite the acceptance by the bank of this assignment, the assignor shall continue to perform and fulfill all covenants and conditions contained in said real estate contract and thereby required to be performed by the assignor." The assignment was signed by Howarth and dated September 6, 1961.

ment was entered in favor of the First National Bank.[6] Howarth has appealed the judgment to this court, contending that the superior court erred in granting a directed verdict against him since there was sufficient evidence presented for the case to be submitted to the jury. We agree with appellant and find it necessary to remand this case once more for a new trial on the merits of Howarth's oral contract claim.

■ In determining whether the trial court erred in granting a motion for directed verdict in this case, we must ascertain whether the evidence presented and the inferences to be drawn therefrom, viewed most favorably to the non-moving party, Phillip Howarth, are such that reasonable persons could not differ in their conclusion as to the outcome.[7] A careful examination of the record below has convinced us that Howarth did in fact present sufficient evidence of an oral contract to require submission of his claim to the jury.

At trial, Howarth testified regarding his conversation with the bank officer, Mr. Linton, concerning insurance coverage and the effect of the assignment. Howarth testified that he understood that the agreement effectively took control of the property "out of his hands." He also stated that he interpreted the assignment clause, which empowered the bank "to do all acts necessary or proper in the premises," to mean that the bank would oversee the property, and would do all that he would have done, such as make sure that insurance and taxes were paid and that repairs and maintenance were kept up.

Although Howarth at first stated that he could not recall with certainty whether insurance was discussed as one of the bank's duties as manager of the property under the assignment, he later testified:

A: I recall we discussed insurance and he explained that to me, that they're going to do these things. And I explained to him that I would certainly expect the bank to do these things.

Q: And [the] things he was going to do he told you were what?

A: Would include—would include insurance and the—seeing the taxes are paid. Overseeing the whole thing.

. . .

Q: Including. . . .

A: I would not know whether the bank was going to prorate . . . Progressive's [the purchaser of the property under the contract of sale] insurance or—or whether they were going to say, Progressive, you have to go buy insurance somewhere else, we don't like this agent or—I don't know what the bank would do about insurance. But I know that . . Linton indicated that the bank would take care of the insurance too, make sure that the property was insured and taxed and—and taken care of.

Howarth further testified that he was sure he had told the bank that the minimum insurance coverage was under the original contract of sale, because Mr. Linton "would [have asked] me how much insurance is on the place."

6. The superior court judge further explained the rationale for his decision to grant the bank's motion for directed verdict as follows:

What proofs have been shown here to indicate that there was in fact a mutual intent of the parties, a meeting of the minds, as to what should be done, and the meaning of this assignment? Reviewing all of the evidence herein, and listening to counsel in argument very carefully as to the issuance of the evidence which was allowed, I cannot find a scintilla of evidence which indicates that there was in fact a mutuality or meeting of the minds and a full and complete intent to form a contract orally or otherwise whereby the bank would undertake certain responsi-

bilities in consideration of the assignment and oral discussions. The oral discussions themselves only show that there is an assumption on behalf of Mr. Howarth as to what the intent of the bank would be. The plaintiff has failed to show any evidence whatever indicating the intent of the bank. Motion for directed verdict is granted.

7. *Leigh v. Lundquist*, 540 P.2d 492 (Alaska 1977); *Wilson v. Sibert*, 535 P.2d 1034 (Alaska 1975); *Holiday Inns of America v. Peck*, 520 P.2d 87 (Alaska 1974); *Otis Elevator Co. v. McLaney*, 406 P.2d 7 (Alaska 1965). *See generally* 5A Moore's Federal Practice ¶ 50.02[1], at 50–24 (2d ed. 1977 and Supp.1978–79).

Additionally, Howarth explained that in his prior dealings with the bank, it had notified him whenever one of his mortgaged properties was underinsured or when a premium was overdue. According to Howarth, on one occasion the bank even had paid an overdue premium and then billed him. Therefore, when the bank officer, Mr. Linton, interpreted the assignment as making the bank the manager of the property, Howarth testified that he assumed that the bank would procure insurance if the purchaser under the sales agreement failed to do so.

Howarth testified further as to his belief that he needed the bank's permission to cancel his insurance policies because the bank required insurance on mortgaged property. After he had signed the assignment and asked for his old insurance policies back, Howarth stated that Linton "looked through the [escrow] file and said, there seems to be plenty of insurance." The bank's decision to return the policies under these circumstances indicated to Howarth that the policies were no longer needed by the bank and that the bank must have satisfied itself that the property was otherwise insured or it would not have released the policies to him.

This evidence, viewed in a light most favorable to appellant, was sufficient to present a jury question as to the existence of an oral contract between Howarth and the bank. While it is a well-known requirement of an enforceable contract that mutual assent to its terms must exist, agreement to a contract may be imputed based on the reasonable meaning of a party's words and acts.[8] The bank's past practices with regard to insurance on property for which it held the mortgage, as they were described by Howarth, and the bank's conduct here in returning the insurance policies to Howarth, together with the statements of the bank's agent that insurance coverage was adequate, could persuade a reasonable jury of the bank's intention to assume responsibility for insurance on the property in question. We have held in similar situations in the past that: "Where the existence of an oral contract and the terms thereof are contested and the evidence is conflicting, it is for the trier of fact to determine whether the contract did in fact exist and, if so, the terms of such contract."[9] We think the superior court erred in finding that no evidence was presented from which the jury could infer the existence of mutual assent as to the allocation of responsibility for maintenance of insurance on Howarth's property.

■ In arguing that the entry of directed verdict should be upheld by this court, the bank also contends that the oral contract fails for uncertainty in its terms and lack of consideration and further, that Howarth's insurable interest in the property was satisfied when he recovered possession from the defaulting purchaser such that he is precluded from additional recovery from the bank. As to the first point, even assuming mutual assent on the question of allocation of responsibility for procurement of insurance on the property, the bank is correct in pointing out that to be enforceable a contract requires "sufficient certainty in the proof of its terms."[10] In a contract for the procurement of insurance,

---

8. See, e. g., Corbin-Dykes Elec. Co. v. Burr, 18 Ariz.App. 101, 500 P.2d 632 (1972); Trujillo v. Glenn Falls Ins. Co., 88 N.M. 279, 540 P.2d 209 (1975); Dwelley v. Chesterfield, 88 Wash.2d 331, 560 P.2d 353 (1977). See also 1A. Corbin, Contracts § 107, at 478–80 (1963 and Supp. 1971). The requirement of mutual assent cannot be defeated by the unexpressed subjective intent of one of the parties; rather, it must rest on an objective manifestation of mutual intent regarding the essential terms of the contract. Dwelley v. Chesterfield, 88 Wash.2d 331, 560 P.2d 353 (1977); Swanson v. Holmquist, 13 Wash.App. 939, 539 P.2d 104 (1975).

9. Curran v. Hastreiter, 579 P.2d 524, 526 (Alaska 1978) (footnote omitted). See also B. B. & S. Constr. Co., Inc. v. Stone, 535 P.2d 271, 273 (Alaska 1975); Nordin v. Zimmer, 373 P.2d 738, 741–42 (Alaska 1962).

10. Maryland Cas. Co. v. Clean-Rite Maintenance Co., 380 F.2d 166, 167–68 (9th Cir. 1967), quoting Hamacher v. Turney, 222 Or. 341, 352 P.2d 493, 497 (Or.1960).

the party proving the contract has the burden of showing the subject matter of the contract, the risk insured against, the amount of coverage, the duration of the coverage, and the premiums to be paid.[11] However, it is permissible to infer the elements of the contract from past dealings of the parties, their conversations and business custom.[12] Here, the evidence offered by Howarth as to the content of the necessary terms of the oral contract was principally based on the provisions of the underlying real estate contract of sale between Howarth and his purchaser.[13] The reference to the underlying real estate contract furnishes sufficient certainty as to the terms of the oral contract concerning procurement of insurance, assuming that such an agreement existed. Whether the parties mutually assented to those terms presents the jury issue in this case.

▮ The bank also asserts that the oral contract fails for lack of consideration because "by executing the assignment, [Howarth] was doing nothing more than performing the promise he had made to [the bank] in the 1950's" to pay off his mortgage from future revenues generated by the property in return for the bank's forebearance on the mortgage obligation. However,

the superior court found that there was consideration for the agreement by the bank to undertake responsibility for insurance in the formal assignment by Howarth of all of his interest in the proceeds of the sale of the property and that both parties would benefit from the transaction. We see no reason to disturb this finding on appeal. Even if we assume that Howarth had agreed previously to remit revenues from the property to the bank, his act in signing the assignment and legally obligating himself to relinquish his right to receive direct payment under the real estate contract of sale constituted sufficient additional consideration to support the bank's promise to insure.[14]

The bank's final argument in support of the directed verdict assumes that, regardless of the existence of an agreement regarding the bank's responsibility for procuring insurance on the property, Howarth's interest as a secured creditor of the purchaser under the real estate contract of sale was fully satisfied when he reclaimed the property as a forfeiture upon default. The bank claims that Howarth would not have been entitled to any further recovery of damages for breach of contract from the

---

**11.** *Rodgers Ins. Agency v. Anderson Machinery,* 211 Or. 459, 316 P.2d 497, 501 (1957). *See also* 12 Appleman, Insurance Law and Practice § 2270, at 220–21 (1969 and Supp.1978). It should be noted that appellant does not actually characterize the oral contract as a contract to procure insurance, as does the appellee bank, but rather treats it as an agreement for the bank to enforce the purchaser's duty under the contract of sale of the property to procure insurance, and secondarily, to procure insurance itself according to the real estate contract if the purchaser failed to do so. Nevertheless, we think the same agreed upon terms must be proven in either case.

**12.** *See Silver v. Daniels,* 156 Mont. 143, 477 P.2d 516, 518 (1970); *Miller v. Liberty Ins. Co.,* 161 Me. 438, 213 A.2d 831, 832–33 (1965); 18 A. Anderson, Couch on Insurance § 74:57, at 289 (2d ed. 1968).

**13.** The real estate contract called for a certain minimum amount of fire insurance on the buildings and other structures on the described property. It further provided that: "Said policy shall be made payable to the parties and any mortgagees as their respective interests may

appear at the time of the loss." The real estate contract required the purchaser to maintain fire insurance coverage. Howarth testified that in the past when he had insured the buildings the bank had paid his overdue premiums and subsequently had billed him. He therefore assumed that the bank would follow the same practice with respect to the purchaser in order to protect its mortgage interest in the property.

**14.** [I]f the bargained-for performance rendered by the promisee includes something that is not within the requirements of his pre-existing duty, the law of consideration is satisfied. It makes no difference that the agreed consideration consists almost wholly of a performance that is already required and that this performance is the main object of the promisor's desire. It is enough that some small additional performance is bargained for and given.

1A A. Corbin, Contracts § 192, at 180 (1963 and Supp.1971). *See S–W Co. v. Schwenk,* 568 P.2d 145, 148 (Mont.1977); *Dunham v. Dunham,* 174 So.2d 898, 912 (La.App.1965).

purchaser subsequent to the forfeiture, including any insurance proceeds from policies taken out by the purchaser where the risk of loss rested with the purchaser under the contract of sale.[15] Since Howarth could not have recovered the insurance proceeds from the purchaser if it had maintained the required coverage, the bank argues that it would be inequitable to allow recovery nevertheless from the bank where no insurance policy was in existence.

■ We think that the bank's contention on this point rests on a faulty premise. Contrary to the bank's position, the law appears to be that if, by reason of a default on an executory contract for the sale of real property, the rights of a purchaser are terminated after the occurrence of a loss insured against under a policy protecting the interest of the vendor, the vendor still may enforce liability of the insurer for the amount of the damage, to the extent of his interest in the property.[16] Although no insurance policy exists in the present case to establish Howarth's rights with respect to insurance proceeds, the real estate contract specifically required that an insurance policy be maintained by the purchaser and "be made payable to the parties and any mortgagees as their respective interests may appear at the time of the loss." The extent of Howarth's interest in the property and his loss due to the fire are questions of fact to be determined at the new trial awarded

in this action. We hold here only that Howarth is not precluded from recovery of the value of the insurance coverage from the bank merely because he reestablished his ownership of the property upon default by the purchaser after the loss occurred.

The judgment of the superior court is Reversed, and this case is Remanded for new trial on appellant's oral contract claim.

CONNOR, Justice, dissenting.

I dissent.

While the oral discussions testified to by Howarth may support Howarth's assumptions of what the bank undertook to do, there is no indication that the bank intended to obligate itself in the manner claimed by Howarth. The representation by Linton that there was already insurance on the property might amount to misrepresentation. But that does not support an obligation to procure insurance. On the state of the record, Howarth's assumptions about the bank's undertaking were unwarranted. In my opinion the evidence was insufficient to take the case to the jury, and the superior court properly granted the directed verdict against Howarth.

I would affirm.

---

15. The bank cites *Geranios v. Annex Inv. Inc.*, 45 Wash.2d 233, 273 P.2d 793 (1954), in support of its argument. In *Geranios,* the court stated that when the vendor's only interest in the proceeds of insurance against earthquake damage which was procured by the purchaser was a security interest for the contract price, and the vendor subsequently gave notice of forfeiture of the executory real estate contract and recovered the property under contract, the right of the vendor to the balance of the purchase price was at an end. The court reasoned that when the right to the purchase price terminated upon forfeiture, there was no further justification for retention of the insurance proceeds by the vendor as security for payment of the price. It should be noted, however, that the real estate contract in *Geranios* did not require the purchaser to take out earthquake insurance (though it did require fire insurance " 'for the seller's benefit as interest may appear' ") and the purchaser assumed " 'all hazards of dam-

age to or destruction of any improvements' " on the property. *Id.* 273 P.2d at 794.

16. *American Equitable Assurance Co. v. Newman,* 132 Mont. 63, 313 P.2d 1023, 1027 (1957), held:

And of course when the buyer obtains insurance for the benefit of the seller there can be no doubt of the seller's right to the proceeds . . . . These conclusions are not altered by the fact that the contract of sale was cancelled by the seller after the fire.

See *Fageol Truck & Coach Co. v. Pacific Indem. Co.,* 18 Cal.2d 731, 117 P.2d 661 (1941); *Brown v. Northwestern Mut. Fire Ins. Co.,* 176 Wash. 693, 30 P.2d 640 (1934). *See also Hansen v. Transamerica Ins. Co.,* 573 P.2d 663 (Mont.1978); *Janosky v. Preferred Ins. Exch.,* 52 Wash.2d 801, 329 P.2d 207 (1958); Annot., 8 A.L.R.2d 1408 (1949).