484 A.2d 302

**Robert L. JONES, et ux.**

v.

**J.H. HISER CONSTRUCTION CO., INC.**

**No. 184, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

Dec. 6, 1984.

672

Thomas E. Walker, Landover (Greenan, Walker, Steuart & Meng, Landover, on brief), for appellants.

John Edward Powell, Rockville, for appellee.

Argued before BISHOP, ADKINS, and GETTY, JJ.

ADKINS, Judge.

Appellee J.H. Hiser Construction Co., Inc. built a house for appellants Dr. and Mrs. Robert L. Jones. The house was erected under a written cost plus construction contract. When the Joneses failed to pay the full amount Hiser claimed under the contract Hiser sought a mechanics lien which in due course was imposed by the Circuit Court for Montgomery County in the amount of $43,505.18.

From that judgment the Joneses appeal. The issues presented are whether Hiser (1) was subject to a duty "to know of, keep track of and advise appellants that actual construction costs were substantially exceeding estimate costs" and (2) whether Hiser breached that duty. We answer both questions in the affirmative and vacate the judgment below.

### Facts

The Joneses desired to build a home in Potomac, Maryland. They approached Hiser. After reviewing plans for a house similar to the one the Joneses wanted Hiser estimated total construction costs to be $200,000. This was within the Joneses' price range. The parties discussed the possibility of a flat fee or fixed-cost contract, but at Hiser's urging, the Joneses agreed to a cost-plus contract, which Hiser proceeded to draft. In pertinent part the contract provided:

> Article 3. The Contractor accepts the relationship of trust and confidence established between him and the [Joneses] by this Agreement. He covenants with the [Joneses] to use his best skill and judgment in furthering [their] interests. He agrees ... to perform the Work in the best way and in the most expeditious and economical manner consistent with the interest of the [Joneses].

*　　*　　*　　*　　*　　*

Article 5. The [Joneses agree] to pay the Contractor for the cost of the Work. . . . Such reimbursement shall be in addition to the Contractor's fee stipulated in Article 6. Article 6. In consideration of the performance of the Contract, the [Joneses agree] to pay the Contractor . . . as compensation for his services as follows: Total fee of $20,000 unless increased per the following adjustments: If the total cost of construction of said dwelling should exceed $225,000.00 (labor, material, subcontractors, etc.) then the builders [*sic*] fee will be increased to equal ten percent . . . of that Total Cost. . . .

*   *   *   *   *   *

Article 11. All portions of the Work that the Contractor's organization has not been accustomed to perform shall be performed under subcontractors. The Contractor shall request bids from subcontractors.

Article 12. The Contractor shall . . . keep such full and detail [*sic*] accounts as may be necessary under this agreement. . . .

Article 13. . . . The following [schedule of periodic draws by Hiser] is based on estimated final cost for construction of dwelling to be $200,000.00. . . .

After consulting with their lawyer the Joneses signed the contract. They also obtained, for construction loan purposes, an independent cost estimate of $204,582.50, including the contractor's fee. Work on the dwelling began in December 1980.

In May 1981 Hiser billed the Joneses for $95,000. Apparently, this was paid without question. Another bill came in August. It showed expenses to date of $145,287, and "Estimated total additional costs" of $112,850. After an allowance of $18,500 in "additional items not completed" it listed the "Total actual bill" as $239,637.00.

Because the Joneses had authorized certain changes in the house plan, they expected the total cost of their home to exceed $200,000. Nevertheless, the projected overrun of almost $40,000 concerned them. This is understandable in

view of testimony produced at the trial indicating that a reasonable cost for the changes was about $24,000. There were discussions about cutting back costs during which Hiser indicated he could "bring the house in" for something between $235,000 and $240,000. The Joneses had sold their other home and were eager to move into the new one (they did so on August 29). They decided to proceed with construction.

Other bills from Hiser followed. A September bill showed total costs as $239,290 and a November bill showed them as $267,963. The final bill, submitted in January 1982, was for $276,251. This exceeded Hiser's August prediction by almost $40,000. Serious differences between the Joneses and Hiser erupted after the September bill was received and Hiser walked off the job in October. The Joneses apparently had others complete the house, for additional sums, so that Hiser's final bill of $276,251 was not in fact the total cost of the house.

In any event, the Joneses paid Hiser a total of $227,000 over the course of the project. Hiser claimed a balance of $48,250.98, after allowing credits of $2,685.62 against the total cost of $277,436.60. After allowing some adjustments by way of setoff, the trial court, as we have seen, granted a lien in the amount of $43,505.18.

## Discussion

In the trial court the Joneses argued at length that Hiser had a duty to be aware of and to inform them about ongoing construction costs. They based this contention on the provisions of the contract and on the testimony of an expert who said that custom and usage in the construction industry so required. The trial judge did not accept this view. Although he mentioned the Joneses' theory of the case at one point in his oral opinion, he decided the case without further reference to it. Thus, he implicitly rejected it. We think he erred in doing so.

It seems to have been the trial judge's position that Hiser should get its lien because there was a cost-plus contract, because the Joneses requested certain cost-increasing changes, and because there was no substantial complaint about workmanship, and no evidence of double billing or padding of expenses. As to all of these facts he was correct. He was also correct in concluding that:

The $200,000 [total cost figure contained in the contract] was an estimate. It was not a warranty.

He did not err in finding that in view of the changes the Joneses had requested they should have been aware at least "right after" the August 1981 bill "that they were over the $200,000 target by a considerable amount." As we have already observed, the Joneses were so aware, and there is evidence indicating that they then accepted a target cost in the $240,000 range.

The judge went astray, however, in thinking that the overrun was "a result principally of [the] changes requested by the Joneses." As he noted, these changes in total amounted to under $24,000. There was no credible evidence to support a larger sum. These changes plus a reasonable deviation from the estimate (7 percent to 10 percent according to expert testimony below) might explain the difference between the original $200,000 target and the $240,000 figure. There were, however, no authorized changes not included in the $240,000, and a reasonable deviation of 7 percent to 10 percent cannot suffice to explain the difference between $240,000 and $277,000.

▆▆▆ What is more significant, though, is that the judge overlooked the provisions of the contract. By this contract Hiser accepted a "relationship of trust and confidence" with the Joneses. It agreed to further their interests by performing "the Work ... in the most ... economical manner consistent with" their interests. It agreed to request bids from subcontractors. It agreed to "keep ... full and detail[ed] accounts." The Joneses were not experts in house construction; Hiser was. John Hiser, president of

the corporation and supervisor of the Joneses' job, testified at length as to his expertise in such matters. Under the contract the Joneses were entitled to rely on Hiser to protect their financial interests. Where there exists a relationship of trust and confidence between parties to a contract one party may justifiably rely on the other's good faith and fair dealing. *See Restatement (2d) Contracts*, § 169, comment c (1979). It was not unreasonable for the Joneses to assume that Hiser would perform its duty to protect their pocketbook. At the very least it was incumbent upon Hiser to be aware of incipient overruns and to inform the Joneses about them so that the latter could make informed decisions about how far they wanted to go. Indeed, at oral argument in this court, Hiser's counsel conceded the existence of such a duty.

■ Hiser did not perform its duty. Although there is evidence that Hiser kept some reasonably detailed accounts, Mr. Hiser testified that he had no obligation to be aware of the relationship between the $200,000 estimate and actual costs (as we have seen, the contract did impose such an obligation) and that he did not know whether he was in fact on target until the very end of the job. He said that when some of the earlier bills were rendered he did not have in hand all the bills from subcontractors. Had he required bids from subcontractors, however, as required by the contract, he would have had information as to the likely amount of those charges. Mr. Hiser's own testimony discloses that although the corporation may have kept records, he himself, as president of the corporation and supervisor of the Joneses' job, did not keep track of increasing costs.

There is conflicting testimony as to the extent to which the Joneses were made aware of the probable cost of the changes they requested. But that is not the issue here. The problem is with other cost overruns. As to them, it is clear that the Joneses were given no information until the end, because Hiser himself was not aware of them until then. Hiser, we hold, breached the contract at the very

least by failing to keep aware of these overruns and by failing to inform the Joneses of them. *Cf. Kostohryz v. McGuire,* 298 Minn. 513, 212 N.W.2d 850, 854 (1973).

*Conclusion*

■■■ We hold that under the contract involved in this case Hiser imposed upon itself a fiduciary or confidential relationship vis a vis the Joneses. When such a relationship exists a person subject to it "is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *Black's Law Dictionary* (5th ed. 1979). Neither party to such a relationship "may take selfish advantage of his trust, or deal with the subject matter of the trust in such a way as to benefit himself or prejudice the other except in the exercise of the utmost good faith and with the full knowledge and consent of the other...." *Id.*

In view of this contractual relationship Hiser had a duty to be aware of the ongoing or escalating costs of construction and to communicate this information to the Joneses in timely fashion. The gathering of this information was within Hiser's ability and expertise, not the Joneses'. Hiser failed to keep effective track of the costs and likely future costs and failed to communicate the appropriate information to the Joneses. Indeed, Mr. Hiser from time to time told the Joneses that the job was "on target." It breached its duty.

■■■ Ordinarily, when a mechanics lien claim is asserted on the basis of a written contract, "performance of the contract is necessary to entitle the contractor to a lien." 57 C.J.S. "Mechanics Liens" § 95. *See Johnson v. Brill,* 295 S.W. 558 (1927, Mo.) (contractor not entitled to lien when he has not substantially performed contract).

■■■ In the usual case, complaints about non-performance of a construction contract have to do with defective workmanship, failure to comply with specifications, and the like. *See, e.g., Schneider v. Menaquale,* 187 Md. 202, 49 A.2d 330 (1946), and *Parker v. Tilghman V. Morgan, Inc.,* 170 Md. 7,

183 A. 224 (1936). In such cases the contractor may be entitled to a lien despite slight omissions or defects in his performance. Damage to the owner by way of these defects or omissions may be set off against the amount of the lien. *See Johnson v. Metcalfe*, 209 Md. 537, 121 A.2d 825 (1956).

This is not such a case. No issue of defective workmanship or failure to meet specifications is before us. Although the Joneses complained below of some shortcomings of this nature, the trial judge made certain allowances for them and that is not questioned on appeal. The Joneses got essentially the house they were bargaining for, except for its excessive price.

The question becomes what portion of this excessive price was the direct result of Hiser's failure to keep track of the escalating costs and to inform the Joneses of them promptly, so that the Joneses might have had the opportunity to take some action to halt the escalation. Dr. Jones, by his own testimony, conceded that a figure of $240,000 was acceptable to him. The Joneses thus effectively waived any objection to allegedly excessive costs included in the $240,-000 figure. Furthermore, $240,000 is a reasonable total price because it accurately reflects the target price ($200,-000) plus the estimated cost of the authorized changes ($24,000) plus an 8 percent reasonable deviation allowed by usage ($16,000). We hold that Hiser was entitled to the $240,000 (less setoffs allowed by the court because of defective workmanship or because some items were not furnished), but that its breach of its contractual duty bars a mechanics lien for any larger sum.

Since the Joneses paid Hiser $227,000 it follows that Hiser is entitled to a lien in the maximum amount of $13,000. As we have noted, the trial court did allow certain setoffs against Hiser's original lien claim. We cannot tell whether any or all of these setoffs were against items included in the $240,000 or involved items billed in excess of that amount. If they were in the former category, the

Joneses are still entitled to the setoffs. If they were in the latter, they are not, since Hiser can recover nothing for billings over and above $240,000. So that the trial court may make an appropriate determination as to the allowable setoffs (which total $3,645.80) we remand for further proceedings under Md.Rule 1071.

JUDGMENT VACATED.

CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID ONE–HALF BY APPELLANTS AND ONE–HALF BY APPELLEE.