Steve MUNN and Jeannie Munn, Appellants,

v.

Jonathan E. THORNTON, d/b/a J.E. Thornton General Contractors, Appellee.

Nos. S–7574.

Supreme Court of Alaska.

April 17, 1998.

William G. Royce, Anchorage, for Appellants.

Sanford M. Gibbs, Brown, Waller & Gibbs, and P. Dennis Maloney, Maloney & Haggart, Anchorage, for Appellee.

Before MATTHEWS, C.J., and COMPTON, EASTAUGH, FABE and BRYNER, JJ.

*OPINION*

FABE, Justice.

I. *INTRODUCTION*

Jonathan Thornton, a general contractor, entered into an oral contract to build a house for Steve and Jeannie Munn. Thornton maintains that he agreed to build the house for the cost of time and materials plus 15 percent with no cap on the total cost. The Munns contend that their agreement included a cap on total cost for the house. The cost escalated above this alleged cap, and the Munns refused to pay the outstanding balance. Thornton filed a complaint against the Munns. After a trial, the superior court ruled in Thornton's favor, finding that he was entitled to recovery under an oral contract or under the doctrines of unjust enrichment and promissory estoppel. The trial court also found that Thornton did not breach his duties under the contract, that he had a paramount lien on the Munns' house, and that the Alaska Unfair Trade Practices Act did not apply to this litigation. We affirm.

II. *FACTS AND PROCEEDINGS*

After a fire damaged a house owned by the Munns, they solicited bids to replace it. Thornton submitted an estimate of $149,800 to rebuild the 1200–square–foot house. Steve Munn then gave Thornton a modified set of plans for a 2316–square–foot house with a 372–square–foot deck. The Munns hired Thornton to drive steel pilings for the house's foundation, agreeing orally to pay Thornton his cost for labor and materials plus 15 percent for this work. The Munns paid Thornton's bill of $4,815.53 for the work, including $30 per hour straight time for labor.

Thornton submitted a new estimate of $169,620 to build the "new custom house as per plans," including his work on the pilings.

Thornton testified that he did not consider this to be a "firm estimate" because the plans were not complete. He also testified that Steve Munn responded that the bid was less than he had expected and that "he had another $50,000 to $80,000 to play with."

The Munns and Thornton agree that Thornton offered two options for building the house. They also agree that the first option involved building it for the total price of $169,620 with written change orders to accommodate modifications at either a negotiated price or on a time and materials basis. They disagree, however, about the terms of the second option, under which they eventually proceeded. Specifically, they dispute whether the second option included a cap on cost, and whether labor was to be billed at a flat rate. Although Steve Munn conceded that Thornton "didn't say in those specific words there's a cap of [$]169,620," Munn testified that, under the second option, Thornton offered to build the house for the cost of time and materials plus 15 percent, subject to a cap of $169,620. He believed that the contract was subject to this cap because Thornton told him "that the [$]169,-620 was a very good number, he was very comfortable with it, he had a very good crew, and he could build the house for less than that." According to Steve Munn, Thornton made this alternative offer because Steve Munn planned to be away from the site during much of the building, and he and Thornton believed that this alternative would avoid the need for Jeannie Munn to "deal with change orders." Finally, Steve Munn testified that he understood that Thornton's actual cost for labor was generally $30 per hour.

In contrast, Thornton testified that under the second option he offered to build the house for the cost of time and materials plus 15 percent. Thornton testified that he explained that he would provide the Munns with a statement of his expenses and copies of invoices for materials or subcontractors at the end of each month. He also testified that he informed the Munns that he would bill carpenters at $30 per hour. Thornton and

the Munns agree that Thornton said he would prepare a written contract, but never did.

On October 18, 1993, Steve Munn called Thornton and told him to begin construction on the house. Thornton began construction and sent detailed bills in November, December, January, and February. The bills itemized labor costs for each employee, generally billed at $30 per hour straight time and $45 overtime. The bills also included itemized costs for materials and subcontractors, and additional charges for "15% Profit" on these subtotals. The Munns paid these first four bills, totaling (along with the bill for the pile driving) $173,440.72. Steve Munn testified that he believed that this amount was within the cap, considering the extra $10,000 cost of an entertainment center he had instructed Thornton to build.

In January 1994 a loan officer with the Munns' bank called Thornton and asked him to estimate how much it would cost to complete the house. Thornton guessed that it would cost $20,000 over the original estimate of $169,620. Later in February, Thornton estimated in a conversation with Munn that it would cost an additional $47,000.[1] Finally, Thornton testified that Munn came to his office after the February billing:

> Well, Mr. Munn came in my office and his first comment was "how bad is it", and we sat down and we began discussing and I told him that right now we were at, I believe, $173,440, something like that. And I told him to the best I could come up with, that it was gonna take another [$]77,-400 to finish. And he stated that, oh, that was more than he expected, but he loved the house, if he were to do it again he wouldn't change a thing, the quality was great, and—and then we went on to discuss the entertainment center in more detail of what he was wanting. And then about the money, he said that he'd used up all of his insurance proceeds, and that he was arranging some type of a note at the bank. He said that he couldn't close on that, and that his funds would be available when the house was done, so he wanted to

---

1. Although it is not entirely clear from Thornton's testimony, it appears that the estimate of $47,000 was in addition to the original estimate of $169,620.

know if I could give him one final bill. And at that point I was thinking, well, we're about 45 days or so from completion, I bill about every 30 days, I'd just be holding—holding the final bill for another 15 days. I told him I didn't think that'd be a problem. He told me that if I needed to get interim financing to go ahead and do that and bill him for the interest and the fees associated with that, and—And he said that I could check with [his loan officer] if I needed to inquire about the funds.

Steve Munn agreed that he told Thornton that he was planning to obtain additional financing to complete the house and requested that all remaining charges be combined in one final bill. Steve Munn also acknowledged that he did not protest any of Thornton's bills, explaining that if the cost of the entertainment center and other items Munn had supplied were subtracted, the total amount he would owe Thornton would still be close to $170,000.[2] Finally, he testified that he received a loan.

Thornton borrowed $85,000 in order to continue work on the house and finished it in early May. The Munns refused to pay the outstanding amount of $109,503.28 claimed by Thornton.

Thornton initiated a civil action based on claims of breach of contract, foreclosure of his mechanics lien, unjust enrichment, misrepresentation and equitable estoppel. The Munns moved for summary judgment. The superior court granted the motion with re-

gard to the misrepresentation claim, but otherwise denied it. Trial without a jury took place before Superior Court Judge Charles K. Cranston over thirteen days between September 19 and October 19, 1995. The court ruled in favor of Thornton, concluding that the Munns breached an oral agreement with Thornton and owed him $107,783.21 for unpaid bills. The trial court ordered that the house be sold to pay Thornton's lien, and awarded Thornton attorney's fees, costs, and prejudgment interest. The Munns appeal.

## III. DISCUSSION

### A. The Superior Court Did Not Err in Finding an Oral Contract on the Terms Urged by Thornton.

The superior court found that the parties entered into an oral contract (1) with no cap on cost, and (2) with a flat rate of $30 per hour for labor. These findings will be discussed in turn.

#### 1. Cap on costs

■ The superior court found that "the parties' statements, both written and oral, and actions, support the conclusion that after on or about October 18, 1993, the parties had an oral agreement that Thornton would construct the Munn house on a time and materials plus 15% basis, with no cap of $169,620." The Munns argue that this finding was in error.[3] They contend that there was no "meeting of the minds" with regard to the existence of a cap.[4] Because the superior

---

**2.** It appears that Steve Munn's testimony was based on the assumption that when Thornton informed him it would take $77,400 to complete the project, the Munns had paid him $137,000 (as opposed to $173,440). The Munns' brief, however, contradicts this testimony. It states that "[l]ater in February when Thornton [had] submitted billings bringing the project total to $173,440, he stated that it would require an additional $77,400 to finish the home."

**3.** In making this argument, the Munns focus on the Restatement (Second) of Contracts § 27 (1981) and comment c to that section. This case, however, does not present the issue addressed by § 27 of whether a party intends to be bound in the absence of a written agreement; all the evidence, including the Munns' own testimony, suggests that the Munns did. Rather, the dispute is whether the record supports the superior court's

finding that the Munns agreed to be bound to the terms as alleged by Thornton.

**4.** The Munns further attack the superior court's finding of an oral contract with the claim that the superior court "was unable to find that the parties reached an express agreement as to the essential terms of the contract as urged by Thornton." (Emphasis omitted.) This argument is contradicted by the court's express findings. The Munns base their contention on an introductory statement by the court that "whatever the parties' agreement may have been on or about October 17, 1993, the agreement changed." Understood in the context of the court's findings, it is clear that this statement means that even if the parties had not agreed to a cost-plus contract with no cap before that date, they did reach an oral agreement on those terms at a later date. Indeed, the court plainly stated that "after[,]

court's finding that the parties reached a "meeting of the minds" and so formed a contract is a question of fact, we review it under the clearly erroneous standard. *Young v. Hobbs,* 916 P.2d 485, 487–88 (Alaska 1996).

 In determining whether the parties have agreed upon the terms of a contract, the court looks to the "objective meaning of words used." *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1281 (Alaska 1985) (citation omitted). "A party cannot rely on its subjective intent to defeat the existence of a contract if its words and actions objectively and reasonably led another to believe" that the party did intend to be bound. *Id.* Furthermore, "it is permissible to infer the elements of the contract from past dealings of the parties, their conversations and business custom." *Howarth v. First Nat'l Bank of Anchorage,* 596 P.2d 1164, 1168 (Alaska 1979). Additionally, "the parties' conduct after entering into the contract is probative of the intent behind the agreement." *Municipality of Anchorage v. Gentile,* 922 P.2d 248, 259 (Alaska 1996).

The record supports the court's finding that the parties agreed to a cost-plus contract without a cap. In addition to Thornton's testimony that he offered to build the house for the cost of time and materials plus 15 percent, Steve Munn testified, albeit somewhat ambiguously, that he never asked and Thornton never expressly offered to make the contract subject to a cap.[5] Together, their testimony supports the court's finding that Thornton's offer was not subject to a cap and that the Munns' words and actions, regardless of their subjective intent, objectively and reasonably led Thornton to believe

that they accepted the terms of that offer. *See Zeman,* 699 P.2d at 1281.

 Moreover, the superior court properly relied upon the parties' interactions before and after entering into the contract in reaching the conclusion that the parties did not intend the contract to be subject to a cap. *See Howarth,* 596 P.2d at 1168; *see also Gentile,* 922 P.2d at 259. First, the court found that prior to entering the agreement Thornton provided foundation and piling work to the Munns on a time and materials plus 15 percent basis. Second, the court found that after entering the agreement Thornton billed the Munns for four months in a manner consistent with an agreement not subject to a cap and that the Munns "paid these bills without question." It further found that the Munns never told Thornton that they believed there was a cap of $169,620; rather, when informed that the cost of the house would be an additional $77,400 over the amount of the cap, Steve Munn "told Thornton he was going to get bank financing" and requested that Thornton "put all the charges on one final bill." The court also found that the Munns subsequently applied for a loan. These undisputed findings support the court's conclusion.

 Finally, the court weighed the testimony of the parties and found that "[t]o the extent that the Munns' testimony is inconsistent with their actions … their actions [are] more persuasive than their testimony" and that "Thornton's testimony [is] more credible than Munn's on the contractual issue." "When the trial judge's decision is dependent largely upon oral testimony of the witnesses seen and heard at trial, this court must give due regard to the trial judge's opportunity to judge the credibility of those witnesses."

---

on[,] or about October 18, 1993, the parties had an oral agreement" on the terms urged by Thornton.

5. On cross-examination, the following exchange took place between Munn and Thornton's attorney:

> Q: You say you had an understanding. Mr. Thornton didn't say there was a cap of [$]169,620, did he?
>
> ....
>
> A: Mr. Thornton didn't say in those specific words there's a cap of [$]169,620, no.

> Q: All right, so there was no cap of [$]169,- 620, was there?
> A: Yes, there was, sir.
> Q: In your mind there was, is that what you're saying?
> A: That is correct.
> Q: But Mr. Thornton never told you that?
> A: Mr. Thornton told me that the [$]169,620 was a very good number, he was very comfortable with it, he had a very good crew, and he could build the house for less than that.

*Evans v. Evans,* 869 P.2d 478, 480–81 (Alaska 1994).

In summary, the superior court's finding of an oral cost-plus agreement with no cap is supported by the testimony concerning contract formation, documentary evidence, the parties' prior dealings, and the parties' subsequent words and actions. Its finding was therefore not clearly erroneous.[6]

### 2. *Labor charges*

The superior court also found that Thornton had explained to Steve Munn that billing for labor would be at a flat rate of $30 per hour. The Munns contend that they never agreed to a "flat" $30 per hour straight time charge for laborers, as opposed to the "actual" cost of labor plus 15 percent. They claim that they understood that Thornton paid his workers $30 per hour and argue that Thornton should have charged them the actual labor cost for construction plus 15 percent. Instead, Thornton billed out most workers at $30 per hour straight time and $45 per hour overtime. Workers were actually paid between $18 per hour and $5 per hour.[7]

■ The evidence supports the superior court's finding that the oral agreement provided for a flat rate of $30 per hour maximum for laborers. Thornton testified that he explained to Steve Munn when he offered to build the house that he would bill carpenters at a flat rate of $30 per hour. The superior court specifically found this testimony more credible than Steve Munn's testimony on the issue. *See Evans,* 869 P.2d at 480–81 (noting that this court gives due regard to

trial judge's opportunity to judge the credibility of witnesses).

As the Munns apparently never disputed the labor charges on Thornton's bills,[8] the trial court's finding on this issue is also supported by the Munns' subsequent conduct. *See Gentile,* 922 P.2d at 259. Additionally, the superior court relied on evidence that prior to entering the contract, the Munns paid Thornton's bill for foundation and piling work which included a $30 per hour rate for labor.[9] Again, such prior dealings may be probative of the parties' agreement. *See Howarth,* 596 P.2d at 1168.

Given Thornton's testimony regarding contract formation, the conduct of the parties, and the prior dealings of the parties, the superior court's finding that the oral agreement provided for a flat rate of $30 per hour maximum for laborers is not clearly erroneous.

### B. *The Cost–Plus Contract Did Not Create a Fiduciary Relationship between Thornton and the Munns.*

■ The superior court found that no fiduciary duty exists between an owner and a building contractor in a cost-plus contract. The Munns argue that a cost-plus contractor under the terms adopted by the superior court "is in a special relationship of trust and confidence with respect to the owner," and that a fiduciary duty should therefore be recognized. They emphasize Thornton's knowledge that Steve Munn would be away from the construction site during much of the

---

**6.** Because we conclude that the superior court did not err in finding that the Munns were liable to Thornton under an oral cost-plus contract with no cap, we need not reach the questions of whether the Munns were liable to Thornton under the doctrines of unjust enrichment and promissory estoppel.

**7.** The $5 per hour worker was charged out at $10 per hour, the $12 per hour workers were charged out at $20 and $25 per hour, and the $16 and $18 per hour workers were charged out at $30 per hour.

**8.** If the Munns believed that Thornton paid each worker $30 per hour, they should have expected the bills they received to show the charge as $30 per hour plus employer contributions and 15

percent. Thornton's bills, however, always stated a flat labor charge for each worker. Furthermore, these bills included specific markups of 15 percent for materials, subcontractors, and equipment but never showed a 15 percent markup for labor.

If, on the other hand, the Munns believed that the $30 per hour charge included the 15 percent markup over the actual labor cost, they never explained why they thought that Thornton did not set out the actual labor subtotal in the bills and then specifically include a 15 percent markup as he did with materials, subcontracts, and equipment.

**9.** This bill differs, however, from the other bills in that it does not include a 15 percent markup for materials and subcontracts.

building. We exercise our independent judgment in reviewing questions of law, such as whether a cost-plus contract creates a fiduciary relationship. *See Summers v. Hagen,* 852 P.2d 1165, 1169 (Alaska 1993). Our "duty is to adopt the rule of law that is most persuasive in light of precedent, reason, and policy." *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

▮▮▮ We have stated that a "fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence." *Paskvan v. Mesich,* 455 P.2d 229, 232 (Alaska 1969). We have also noted that "[l]oyalty and the disavowal of self interest are hallmarks of the fiduciary's role." *Wagner v. Key Bank of Alaska,* 846 P.2d 112, 116 (Alaska 1993). Fiduciary relationships are generally defined by a level of trust beyond that in ordinary business relationships. *See Black's Law Dictionary* 625 (6th ed.1990) (stating that fiduciary duty is "the highest standard of duty implied by law"). Thus, we have recognized fiduciary relationships between business partners or co-owners, *see, e.g., Paskvan,* 455 P.2d at 232, between professionals such as lawyers and their clients, *see, e.g., Cummings v. Sea Lion Corp.,* 924 P.2d 1011, 1021 (Alaska 1996), and in relationships involving trusts and guardianships. *See, e.g., Alaska State Employees Assoc. v. Alaska Public Employees Assoc.,* 825 P.2d 451, 459 (Alaska 1991). We have not, however, recognized a fiduciary relationship between contractor and owner.

The Munns' only precedential support on this issue is *Jones v. J.H. Hiser Construction Co.,* 60 Md.App. 671, 484 A.2d 302 (1984), in which the court held that a cost-plus contractor owed a fiduciary duty to the owners of a home.[10] *See id.* 484 A.2d at 305. The court in *Jones,* however, relied on an express provision in the parties' contract that the contractor "accepted a 'relationship of trust and confidence'" with the owners, "agreed to further their interests by performing 'the Work

... in the most ... economical manner consistent with' their interests," and promised "to 'keep ... full and detail[ed] accounts.'" *Id.* at 304. Because *Jones* deals with a breach of the express provisions of a contract, it offers scant support for implying a fiduciary duty in this case.

As fiduciary duties are reserved for relationships involving heightened levels of trust, we decline to create a fiduciary relationship between contractor and owner under a cost-plus contract.

### C. *Thornton Did Not Breach the Duty of Good Faith and Fair Dealing.*

▮▮▮ The relationship between contractor and owner is governed by the covenant of good faith and fair dealing implied in every contract under Alaska law. *See Guin,* 591 P.2d at 1291. This implied covenant provides "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Id.* (footnote omitted). The superior court concluded that although Thornton was bound to act in conformity with the covenant of good faith and fair dealing, there was insufficient evidence to support a finding that he had failed to do so.

The Munns argue that Thornton breached the implied covenant of good faith and fair dealing in several ways. First, they assert that Thornton breached his duty to inform them *"prior* to performing work [that would] materially increase the cost over estimates." The Munns cite no authority in support of this alleged duty and fail to specify any costs of which Thornton failed to advise them. Moreover, by the Munns' own admission, Thornton informed them that the cost of completion would significantly exceed the estimate before he completed the construction. The record, therefore, does not support their allegation that Thornton acted improperly.

Second, the Munns contend that Thornton breached his duty to charge only actual costs for the installation of carpeting and vinyl. Again, they cite no authority in support of

---

10. The Munns also cite to a clause in a standard form contract published by the American Institute of Architects. The form contract played no part in the dealings between the parties and provides weak support for the Munns' position.

their claim and fail to demonstrate that Thornton charged more than reasonable costs.

■■■ Finally, the Munns argue that Thornton breached his "duty to monitor subcontractors['] work." They contend that a plumbing and heating subcontractor overcharged for its work. Yet, the Munns do not contend that the subcontractor's charges were unreasonable or not actually incurred. The Munns also argue that Thornton's failure to monitor the work and costs of subcontractors is exemplified by overbilling for the cost of a "double throw breaker switch." They contend that a subcontractor overcharged for the switch and that Thornton passed on the extra cost to them. The evidence the Munns rely on in support of this argument, however, is inconclusive. Moreover, the Munns fail to point to any evidence regarding the amount Thornton actually charged them for the switch; they merely point to a document that estimates costs "to show the general nature of the changes that have developed on the Munn custom home." [11]

Because the record does not provide support for the Munns' argument that Thornton breached the implied covenant of good faith and fair dealing, this argument fails. The superior court did not err in its ruling on this issue.

### D. The Superior Court Did Not Err in Granting Thornton a Paramount Lien on the Munns' Property.

■■■ After ruling in favor of Thornton, the superior court declared that Thornton had a paramount lien upon the Munns' property. The Munns argue that the superior court erred in making Thornton's lien paramount to their homestead exemption. We disagree. As a provider of "labor or materials furnished to make, repair, improve, preserve, store, or transport the property," AS 09.38.065(a)(2)(B), Thornton may enforce a lien against property falling under the homestead exemption provided by AS 09.38.010(a). Thus, the superior court did not err in ordering a paramount lien against the Munns' property. [12]

### E. The Superior Court Did Not Err in Ruling that the Unfair Trade Practices Act Does Not Apply to the Litigation.

■■■ The superior court ruled that the Alaska Unfair Trade Practices and Consumer Protection Act, AS 45.50.471–.561, did not apply to this litigation. Specifically, the trial court found that the Munns' reliance on the statute was misplaced because the contract between the Munns and Thornton was not an "installment sale" under the statute. The Munns argue that this ruling was erroneous.

■■■ The Unfair Trade Practices Act does not define the term "installment sale." An "installment sale" is defined generally as a "[c]ommercial arrangement by which buyer makes initial down payment and signs a contract for payment of the balance in installments over a period of time." *Black's Law Dictionary* 799 (6th ed.1990). The definitions of "retail installment contract" and "retail installment transaction" found in the Alaska Retail Installment Sales Act and the Installment Sales Act are aimed at sales contracts that create a debt obligation be-

---

**11.** At oral argument before this court, the Munns argued that Thornton's construction costs were not reasonable. As this issue was raised for the first time at oral argument and was neither listed in the points on appeal nor adequately briefed, we do not address it. *See Wren v. State*, 577 P.2d 235, 237 n. 2 (Alaska 1978). To the extent that this issue was subsumed by the Munns' argument that Thornton breached implied duties, the Munns failed to address the court's findings and conclusion, based on the testimony of expert witnesses in the residential construction industry, that "the total cost of construction claimed by Thornton is reasonable."

**12.** The Munns also argue that under AS 34.35.050, the statute providing for mechanics' liens, lien protection cannot extend beyond "contract price." They contend that Thornton's breach of implied duties under an implied contract should decrease the contract price and thus limit Thornton's recovery. Because we affirm the superior court's finding of an oral contract on the terms urged by Thornton and reject the argument that Thornton breached implied duties, this argument fails.

tween buyer and seller.[13] AS 45.10.220(9), (10); *see also* AS 45.10.010. The contract between the Munns and Thornton is not an installment sale under these definitions. Instead of providing for the Munns to pay off a previously agreed-upon sum over time, the contract in this case required the Munns to pay Thornton for his labor and expenses as he incurred them. Although these payments occurred in response to monthly billings, the parties did not treat them as payments on an existing debt between the Munns and Thornton nor did they include a "service charge." As the trial court found, these payments are more properly characterized as "progress payments to plaintiff, more or less consistent with plaintiff's expenditures on the project." Therefore, the provision relied on by the Munns dealing with installment sales contracts is not applicable to this case, and the superior court's ruling was not in error.[14]

## IV. CONCLUSION

We AFFIRM the decision of the superior court.

13. AS 45.10.220(9) & (10) provide:
(9) "[R]etail installment contract" ... means a contract, other than a retail charge agreement or an instrument reflecting a sale price made under a retail charge agreement, entered into or performed in the state for a retail installment transaction; "retail installment contract" includes
(A) a chattel mortgage;
(B) a conditional sale contract; and
(C) a contract in the form of a bailment or a lease if the bailee or lessee contracts to pay a sum substantially equivalent to or in excess of the value of the goods sold as compensation for their use and if it is agreed that the bailee or lessee is bound to become, or for no other or a merely nominal consideration, has the option of becoming the owner of the

goods upon full compliance with the provisions of the bailment or lease;
(10) "retail installment transaction" means a transaction in which a retail buyer purchases goods or services from a retail seller under a retail installment contract or a retail charge agreement which provides for a service charge under which the buyer agrees to pay the unpaid balance in one or more installments[.]

14. The superior court also found that the statute "does not apply to real property transactions." Because we conclude that the contract between the parties was not an installment sale and that the Unfair Trade Practices Act therefore does not apply to this litigation, we need not address this issue.