Adolf ZEMAN, d/b/a A.Z. Construction, Appellant,

v.

LUFTHANSA GERMAN AIRLINES, a Foreign Corporation, Appellee.

No. S–221.

Supreme Court of Alaska.

May 17, 1985.

---

Lawrence L. Hartig, Robert J. Mahoney, Hartig, Rhodes, Norman, Mahoney & Edwards, Anchorage, for appellant.

John C. Pharr, Robert L. Richmond, Richmond & Associates, Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Adolf Zeman, d/b/a A.Z. Construction, appeals from a grant of a summary judgment by the Superior Court in favor of Lufthansa German Airlines. Zeman sought to recover compensatory and punitive damages from Lufthansa based on breach of lease contract, promissory estoppel and fraud theories. We reverse in part and affirm in part.

Zeman built three 24-unit apartment buildings in 1976 on Eureka Street in Anchorage. Zeman entered into a lease agreement with Air France for 32 units, to commence November 1, 1977, and to last

for a term of two years. In 1978, Zeman sold these buildings to Jack White Realty and leased them back until November 1, 1979.

In 1978, Zeman bought more land on Eureka Street, intending to build a 36-unit building to rent to Air France. This purchase of property was financed by Federal Credit Union and Swain-Williams. Zeman applied for and received a $790,000 construction loan from Prudential Mutual Savings Bank, Seattle.

In October 1978 Zeman met with Mr. Weisshun, Lufthansa's Anchorage station manager, to discuss the possibility that Zeman would provide Lufthansa's Anchorage accommodations. The proposed 36-unit building was the focus of interest. The parties dispute who initiated this meeting.

On October 16, 1978, Zeman sent a letter to Weisshun documenting his offer that Lufthansa occupy the 36-unit building. When this offer was relayed to Germany one week later, the cable stated that Zeman claimed "he would build the building in any case before April 1 because he could rent the apartments (according to him) very quickly and well to other air carriers if there should be no interest on the part of [Lufthansa]."

On January 9, 1979, Zeman inspected the site with Weisshun and Mr. Kisling, the Lufthansa official "in charge of planning and administration for cockpit crews." That evening, the three of them had dinner together and discussed Zeman's proposal. They discussed various details including the number of units needed by Lufthansa, the cost per unit per month, the number of kitchens/lounges Zeman would build and the length of a lease. No lease or written instrument was signed at this time.

During early 1979 Lufthansa received numerous solicitations from various hotels and apartment building owners regarding provision of Lufthansa's Anchorage accommodations. At this time, Lufthansa housed its crews at two apartment complexes: Eden Lane Apartments and Anchor Arms Apartments.

On January 19, 1979, Kisling sent letters to Zeman, to the Eden Lane Apartments owner and to the Anchor Arms Apartments owner. The letters to Eden Lane and Anchor Arms gave notice that Lufthansa would quit both premises effective April 1, 1979. At the same time, the letters requested similar three-month prolongations of each lease for fourteen apartments in each complex—up to June 30, 1979, in other words.

The letter to Zeman states its purpose "is to inform you of Lufthansa's intention to accommodate our inflight crews at Anchorage in your appartments [sic], that you are constructing very near of those in 3311 Eureka Street, Anchorage." This tantalizing document also contains language that "[Lufthansa is] not in the position of signing right now an agreement we have in mind.... [W]e cannot risk a situation on the one hand of having a binding contract on the other hand of not having an adequate accommodation for our crews on April 1st due to the fact that the appartments [sic] in question have not been finished on time." Lastly, the letter states that "[a]s soon as we are able to convince ourselves that the completion will be within a fortnight, the agreement we have in mind can be signed."

Correspondence from Kisling to Weisshun, evidently intended to apprise Weisshun of the contents of the three letters, states:

As discussed with you already, we ... basically have decided in favor of the Zeman apartments without, however, giving Mr. Zeman already a final "yes". The reason herefor please see in the doubts we have whether these apartments can be completed in time. Therefore, also the enclosed letter of intent. It has a purpose to document to Mr. Zeman our definite intent to move to him without, however, to sign payment obligations at a moment at which the apartments are not yet ready for occupancy.

Zeman's January 23 response acknowledges receipt of Kisling's letter which expressed "your [Lufthansa's] intention to

accomodate [sic] your flight crews in my new apartment currently under construction located at 3400 Eureka Street." Zeman added that he is

prepared to work my crews on a longer work schedule. I am confident that I can meet the occupancy date that you require.

So that I may meet your requirements, please advise me of the number of units you require.

I look forward to entering into an agreement with you. Please contact me at your earliest convenience so that I may proceed with the proper work schedule.

Lufthansa pursued other arrangements to find housing. On March 1, Lufthansa's Mr. Westermann met separately with Zeman and Mrs. Michael, owner of the Anchor Arms. Shortly afterwards, Zeman sought a letter of intent. He was told that Lufthansa could not provide him with such a document. Zeman renewed his request several days later, and on March 12 a telex from Germany to the Anchorage station repeated Lufthansa's earlier refusal to "give any commitment to Mr. Zeman." The substance of this telex was relayed to Zeman.

The discussions with Mrs. Michael proved fruitful when on March 16 Weisshun sent her a letter stating that "Lufthansa German Airlines will enter into a one year agreement with you if the conditions discussed at the meeting on March 01 1979 are met."

Zeman proceeded with the construction of the building that he intended for Lufthansa, and he made additional arrangements to build a second new complex on the property, intended for Air France's use when the lease for 3311 Eureka expired on November 1, 1979. Zeman secured construction financing through AMFAC Bank, Seattle, and new long-term financing for both buildings through Life Investors Insurance Co. for $1,400,000. Zeman made modifications on the first building to meet what he believed were the needs of Lufthansa. Zeman also consented to judgment

against himself in a suit brought by Swain-Williams for delinquent payments on the property acquired for the first new building. He did this thinking that Lufthansa would sign a lease for one of the new buildings on the property, which in turn would free the loan from Life Investors, which would provide funds to pay the delinquency.

In late July, Zeman received a letter indicating that Lufthansa would stay at the Anchor Arms and not at Zeman's building. Part of the letter states that the "[union's hotel complaints] commission has given preference to the city located apartments and by this decided that our crews shall remain accommodated there."

At the same time, Kisling sent a communication to the Anchorage station to explain the July letter sent to Zeman. This communication states that in January 1979 Lufthansa "gave Mr. Zeman a letter of intent that was not binding for us."

After Lufthansa's decision not to rent from Zeman, he could not find other renters and therefore could not close the $1,400,000 long-term loan. Swain-Williams executed on the rents due from Air France to Zeman under the sublease. Zeman could not pay the rent due to Jack White Realty, who cancelled that lease. Air France refused to rent the building intended for Lufthansa. Zeman lost the building to the bank in late 1979.

Zeman filed suit against Lufthansa on October 22, 1979, alleging that an oral contract had been formed in January 1979 and that Lufthansa breached the contract, and defrauded him. He sought to recover his direct losses, consequential damages and punitive damages. Lufthansa moved for summary judgment on all counts, which was granted. Zeman's motion for reconsideration was denied and this appeal followed.

## II. NEW ARGUMENTS ON APPEAL.

Preliminarily, Lufthansa argues that Zeman attempts to raise several arguments for the first time on appeal. Specifically,

Lufthansa contends that Zeman's effort to classify a key letter of January 19, 1979, as evidence of a condition subsequent to an agreement is a new argument. Second, Lufthansa contends that Zeman's statement of law that contemplation of a future written lease does not prevent an oral contract is based on a new allegation that the parties did in fact contemplate a future written lease.

■■■ As a general rule, a party may not present new issues or advance new theories to secure a reversal of a lower court decision. *O'Neill Investigations v. Illinois Employers Insurance*, 636 P.2d 1170, 1175 n. 7 (Alaska 1981). *O'Neill* adopted a liberal approach towards determining whether an issue or theory of a case was raised in a lower court proceeding. As the court explained:

> Although O'Neill's present theory of coverage was never expressly presented to the trial court, we consider it here because it is not dependent on any new or controverted facts, and *because it is closely related to O'Neill's trial court theory and could have been gleaned from its pleadings.*

*Id.* (emphasis added). With the guiding light of *O'Neill*, this problem resolves into asking first whether the two challenged arguments were raised explicitly in the court below and, if not, whether they are closely related to Zeman's trial court arguments and could have been gleaned from Zeman's pleadings.

As to the first inquiry, Zeman's complaint expressly alleges the existence of an oral contract, but nowhere does it specify its terms and conditions. As to the second inquiry, the pleading is silent regarding contemplation of a future written lease by the parties.

■■■ Even though the key words and phrases "condition subsequent" and "contemplation of a future written lease" do not appear in the pleadings, these arguments (1) are not dependent on new facts, (2) are closely related to Zeman's trial pleadings and (3) could have been gleaned from the pleadings. Common sense indicates that if a party alleges the existence of an oral contract, the party will attempt to prove its terms and conditions. Similarly, it is plausible to include the question of a future written lease within the broad scope of the alleged oral contract, and its terms and conditions. The appellant need not have expressly presented every theory supporting an argument before the trial court, but can expand or refine details of an argument otherwise preserved on appeal. *See Deal v. State*, 626 P.2d 1073, 1077 (Alaska 1980).

## III. ISSUES OF FACT RE: AN ORAL CONTRACT.

■■■ The issues remaining to be discussed concern the propriety of the trial court's grant of summary judgment. When reviewing a grant of summary judgment, this court "must determine whether there was a genuine issue of material fact and whether the moving party was entitled to judgment on the law applicable to the established facts." *Brock v. Alaska International Industries*, 645 P.2d 188, 190 n. 6 (Alaska 1982). All reasonable inferences of fact from proffered materials must be drawn against Lufthansa, the moving party, and in favor of Zeman, the non-moving party. *Howarth v. First National Bank*, 540 P.2d 486, 490 (Alaska 1975), *aff'd*, 551 P.2d 934 (1976).

To bring into focus the problem posed by this appeal, it is helpful to know precisely what the trial court determined in its order granting summary judgment. Relative to the existence or non-existence of an oral contract, the trial court made three key findings:

1. That the evidence "shows at most only that defendant expressed a strong interest in entering into a lease for the subject apartments at a future date."

2. That Zeman's letter of January 23, 1979 and all the other correspondence "leave no doubt that defendant merely expressed a willingness to enter into a lease at a future date while expressing a simultaneous unwillingness to be bound contractu-

ally until the apartments had been finished and a formal lease signed."

3. Based on # 1 and # 2, that "the manifestation of mutual assent required for the formation of a binding contract was absent...."

## A. MUTUAL ASSENT.

 The trial court found that the tangible and testimonial evidence yielded only one reasonable conclusion: no mutual assent. Mutual assent is an elementary requirement for a binding contract. *State v. Fairbanks North Star Borough School District*, 621 P.2d 1329, 1331 n. 3 (Alaska 1981). It is equally elementary that mutual assent can be found in the objective meaning of words used. *Howarth v. First National Bank of Anchorage*, 596 P.2d 1164, 1167 (Alaska 1979). A party cannot rely on its subjective intent to defeat the existence of a contract if its words and actions objectively and reasonably led another to believe a contract had been entered.

We turn to the documentary evidence in the record. To affirm the grant of summary judgment, we must conclude that the letters exchanged by the parties in January 1979 have only one reasonable interpretation: the parties were still negotiating and any reasonable person in Zeman's position would have understood that. Ten days after the dinner discussion Kisling sent Zeman a letter stating:

> [Lufthansa] cannot risk a situation on the one hand of having a binding contract ...

 Taken alone, this phrase would be persuasive evidence that Lufthansa intended there be no contract at this time. The same letter, however, contains other statements reasonably open to different interpretation. The first paragraph begins:

> This is to inform you of Lufthansa's intention to accommodate our inflight crews at Anchorage in your appartments [sic] ...

The second paragraph begins:

> As the appartments [sic] in question are in the very beginning of construction and

not yet finished, we are not in the position of signing right now an agreement we have in mind.

The trial court concluded that statements such as these were evidence only of a nonbinding agreement to agree. But the language "Lufthansa's intention to accommodate" and "an agreement we have in mind" constitutes evidence from which a reasonable person could infer mutual assent.

Zeman's reply letter of January 23 contains similar conflicting passages. He begins by parroting Lufthansa's opening words:

> I am in receipt of your letter dated January 19, 1979, expressing your intention to accomodate [sic] your flight crews in my new apartment ...

By itself, this phrase could signal Zeman's state of mind that a contract had been formed. But other language employed by Zeman undermines any easy reading of the contents. He concludes by remarking:

> I look forward to entering into an agreement with you.

Lufthansa, of course, emphasizes this sentence in arguing no mutual assent. If Lufthansa could point only to the most favorable phrases in these letters as evidence of the parties' intentions its case for summary judgment would be more tenable. We cannot ignore, however, the ambiguous language that favors Zeman's argument.

 Because the writings are ambiguous, interpreting them can best be achieved by considering them in light of what was said and promised, if anything, during the dinner on January 9. Resorting to evidence extrinsic to the letters can be helpful, similar to using extrinsic evidence to interpret ambiguous written contracts. Interpretation of these letters depends on knowledge of surrounding circumstances, i.e., what was said at the previous meetings between Zeman and Lufthansa's representatives. It presents a question of fact which should not have been resolved in a

motion for summary judgment.[1] *See, e.g., Smalley v. Juneau Clinic Building*, 493 P.2d 1296, 1305 (Alaska 1972); *Walsh v. Walsh*, 18 Cal.2d 439, 116 P.2d 62, 65 (1941).

Lufthansa's efforts to characterize the evidence of mutual assent *only* as "tentative and conditional" are not convincing. Lufthansa argues it would be "inconceivable" for a major international airline to make an oral lease for its crews over a dinner in Anchorage. Whatever the usual business practices of a major air carrier might be, they are not the issue before us. The conversations, writings and conduct of Lufthansa's representatives could have indicated to a reasonable person in Zeman's situation the existence of an agreement arrived at over dinner and memorialized in later letters.

Lufthansa also argues that Kisling's statement of intent not to be legally bound in his letter of January 19 is impervious to interpretation. However, taken in context, the language could indicate a condition subsequent to an oral agreement: if the building, when completed, does not meet Lufthansa's requirements, *then* the airline will be discharged from obligation under the agreement. Moreover, Lufthansa cannot in fairness isolate this one phrase and exclude from the court's consideration other language in the same document which can reasonably be interpreted in Zeman's favor. Review of a summary judgment demands that all evidence in the record be interpreted reasonably in favor of the non-moving party.

### B. MATERIAL TERMS.

Lufthansa attacks the possibility of an oral contract contemplating a future written lease by contending that the parties did not agree to all material terms. An oral agreement to lease which contemplates a later writing is legally enforceable only if the parties agree on the terms to be incorporated in the later writing. *Thrift Shop v. Alaska Mutual Savings Bank*, 398 P.2d 657, 658–59 (Alaska 1965). Although the trial judge made no mention of material terms in his order, the judgment can be affirmed if the record reveals no issues of fact regarding the failure to assent to all material terms.

There is evidence in the record that after the dinner in January 1979 the parties had reached an understanding regarding rental costs, the number of units needed, the length of the lease and various special details requested by Lufthansa. Lufthansa places particular emphasis on the indefiniteness of the number of units to be rented, and of the completion and occupancy dates.

There is evidence in the record that Lufthansa would yield on its request for April 1 occupancy, and that an exact date would not be crucial because Lufthansa could move out of its other accommodations on short notice. There is also evidence in the record that once Zeman could satisfy Lufthansa's minimal requirement of 28 units the extra units Zeman planned to build were not material to the parties' agreement.

Lufthansa argues vigorously that as a matter of law the negotiations between the parties constituted no more than an unenforceable agreement to agree. Lufthansa points to several cases to bolster its position. *Western Airlines v. Lathrop Co.*, 499 P.2d 1013 (Alaska 1972), involved a lease extension allegedly agreed to by the parties. Correspondence between the parties indicated that the land on which the

---

1. It is important to keep in mind that an alleged oral contract poses special difficulties in a summary judgment context. Evidence may often, as in this case, consist of the conflicting testimony of parties based on memory. Care must be taken to avoid depriving the factfinders of their function. As we have said:

 Where the existence of an oral contract and the terms thereof are contested and the evi-

dence is conflicting, it is for the trier of fact to determine whether the contract did in fact exist and, if so, the terms of such contract. *Curran v. Hastreiter*, 579 P.2d 524, 526 (Alaska 1978) (footnote omitted); *accord Riley v. Northern Commercial*, 648 P.2d 961, 969–70 (Alaska 1982).

leased building sat might be claimed by the state for an airport improvement plan. If the state did use the area, the parties allegedly agreed to move the building to a "suitable area." The court held the agreement to find a suitable area "did not contain a sufficiently definite offer to create a contract upon its acceptance...." *Id.* at 1020. Instead, the parties merely agreed to agree. *Western Airlines* did not involve an appeal from a summary judgment.

In *Malone Construction v. Westbrook,* 127 Ga.App. 709, 194 S.E.2d 619 (1972), the court affirmed a grant of summary judgment dismissing a claim for breach of contract to build a shopping center. At one point, the parties both signed a letter of intent which stated, *inter alia,*

> If a lease can be consummated at this above referenced price, then we will enter into a contract with above referenced price as the guaranteed maximum....

*Id.* 194 S.E.2d at 620. Explaining its affirmance, the court stated that

> [t]hese letters all show nothing more than a continuing negotiation process with at most an agreement to contract in the future when and if all terms and conditions have been assented to by the parties.

*Id.* 194 S.E.2d at 621.

The last case cited by Lufthansa relative to agreements to agree is *Opdyke Investment v. Norris Grain,* 94 Mich.App. 770, 288 N.W.2d 362 (1979). *Opdyke* was reversed on appeal to the Michigan Supreme Court. *Opdyke Investment v. Norris Grain,* 413 Mich. 354, 320 N.W.2d 836 (1982).

In *Opdyke,* plaintiff alleged breach of a contract to build a sports arena. The trial court granted defendants' motion for summary judgment, holding that a key letter indicated no more than an unenforceable agreement to agree.[2] The court of appeals

affirmed, finding that a "number of essential terms were expressly left to future agreement, or were simply lacking." 288 N.W.2d at 363.

The supreme court reversed, noting that "[w]hether the parties intend to be bound only by a formally written and executed final document is a question of fact...." 320 N.W.2d at 838. The court acknowledged the letter's tentative language, but indulged reasonable inferences favorable to the non-moving party and suggested that perhaps the parties had intended a "series of increasingly detailed contracts...." *Id.* Additionally, the court referred to evidence extrinsic to the letter to help justify its interpretation in the plaintiff's favor. *Id.* 320 N.W.2d at 839. Finally, the court criticized the trial and appellate courts' careful scrutiny of the letter to discern the parties' intent, emphasizing "that such a factual inquiry should have been made only by a trial court fact-finder after consideration of all of the relevant evidence to be produced at trial on the point." *Id.*

 The case before this court more closely resembles *Opdyke* than *Western Airlines* or *Malone.* The record in this case contains evidence which can reasonably be interpreted to indicate definiteness as to mutual assent and material terms. We reverse the grant of summary judgment as to these issues and remand for trial.

## IV. ISSUES OF FACT RE: PROMISSORY ESTOPPEL.

Zeman argues that genuine issues of fact exist regarding the elements of promissory estoppel. The trial judge determined that "the evidence is uncontradicted that plaintiff Zeman did not substantially change his position in reliance on any of defendant's statements." This conclusion was based on

---

**2.** The letter contained, *inter alia,* the following language:

> The actual implementation of all agreements will await the drafting and execution of the contracts and leases that will be required to cover the proposed transaction. This letter will serve to express the intention of both

parties to seek, in good faith, as soon as practical, the drafting and execution of such documents as may be required to cover all the matters herein expressed and such other matters as may be mutually agreed.
288 N.W.2d at 363.

the finding that "plaintiff intended to construct the apartment complex regardless of whether defendant would lease it...."

▆▆▆▆▆▆ The summary judgment will be reversed only if the evidence in the record, taken in a light most favorable to Zeman, the non-moving party, poses genuine issues of material fact regarding this theory. *Brock*, 645 P.2d at 190; *Howarth*, 540 P.2d at 490. This court recently approved the formulation of promissory estoppel set out in Restatement (Second) of Contracts § 90 (1979).[3] *Glover v. Sager*, 667 P.2d 1198, 1202 (Alaska 1983). Four elements are needed to make out a case of promissory estoppel:

1) The action induced amounts to a substantial change of position;

2) it was either actually foreseen or reasonably foreseeable by the promisor;

3) an actual promise was made and itself induced the action or forbearance in reliance thereon; and

4) enforcement is necessary in the interest of justice.

*State v. First National Bank*, 629 P.2d 78, 81 (Alaska 1981); 1A A. Corbin, Corbin on Contracts § 200, at 215–21 (1963).

We must determine whether a decision by a builder/developer *to alter* a pre-set construction schedule and plans, if reasonably induced by another's promise, can constitute a substantial change for purposes of promissory estoppel. If so, we must then determine whether the specific changes Zeman made in his construction schedule and plans rise to a level which meet the law's requirements.

▆▆▆▆ We have little difficulty concluding that altering an existing construction schedule and plan may constitute a substantial change. There is no practical reason to distinguish between creation of a new blueprint or alteration of an existing one. Thus, the trial court was mistaken in its assumption that Zeman's pre-existing

plan to build *ipso facto* prevented a finding of substantial change.

The real question is whether the changes actually induced represent substantial and actual economic losses. Zeman argues that he underwent substantial changes of position even though he always intended to build the apartment complex. He emphasizes the timing of the construction, obtaining financing for two projects, furnishing the units for Lufthansa, the necessity of building another complex to accommodate Air France when the lease expired, and agreeing to judgment against himself in Swain-Williams' suit for delinquent payments for the property on which the Lufthansa units were built.

▆▆▆▆▆ Whether particular actions represent substantial changes is a question of all the circumstances and is not determinable by reference to a set formula. 1A A. Corbin, Corbin on Contracts § 200 at 216 (1963). Courts look for evidence of actual and substantial economic loss. *E.g., Weiner v. Romley*, 94 Ariz. 40, 381 P.2d 581, 583–84 (1963); *Brand S Corp. v. King*, 102 Idaho 731, 639 P.2d 429 (1981). Each of Zeman's proffered examples of loss, therefore, must be examined to determine its substantiality and actuality in the context of his admitted decision to build in any event.

First, Zeman argues that acceleration of the construction schedule from an October 31, 1979 completion date to a May completion date required "accelerated draws on the construction loans and payment of interest." He makes the conclusory statement that the six-month acceleration is substantial without providing figures to quantify the extent of the loss occasioned by acceleration. The costs of acceleration *could* be substantial if they significantly increased the price of the project. These calculations are not available in the record.

Second, the money spent furnishing the units *could* signify a substantial loss de-

---

**3.** Section 90(1) states in pertinent part:
A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person

and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise....

pending on the cost of the furnishings actually supplied to meet Lufthansa's special needs as a proportion of the overall project. The record does not contain data to answer this question satisfactorily.

■■■ Third, Zeman consented to judgment against himself in Swain-Williams' action for delinquent payments due on the property acquired for the project. Zeman did this believing that Lufthansa would sign a lease which would in turn free loan funds which he could use to pay Swain-Williams. This loss, even if substantial, is not within the scope of reasonable reliance on Lufthansa's statements. Assuming for the sake of argument that Lufthansa did agree to lease the building, that promise does not justify Zeman consenting to judgment against himself. Lufthansa should not be held responsible for Zeman's unilateral decision to handle his legal difficulties with a *third party* in a particular manner.

Finally, the question of financing the Lufthansa building, and construction of another building for Air France, can be disposed of much like the confessed judgment argument. Assuming that Lufthansa agreed to lease the units, Zeman's decision to build another complex so he could continue his business arrangement with Air France has no connection with Lufthansa. Zeman's business decision to construct more apartments was one of many ways he could have chosen to maintain business ties with the French company. Similarly, construction of the second building may indeed have required more financing, but Zeman cannot hold Lufthansa responsible for the financing costs associated with that building.

■■■ We remand this portion of the judgment with instructions to determine the substantiality of the costs associated with accelerated loan draws and furnishing the apartments to meet Lufthansa's special requests. If either of these costs proves substantial, then Zeman may pursue the promissory estoppel theory. Otherwise, he may not.

## V. ISSUES OF FACT RE: FRAUD.

The trial court found "[t]here is no evidence of fraud or any other wrong doing [sic] on defendant's part." Zeman's claim of fraud is based on Lufthansa's "continued misrepresentations that it would honor its promise to lease [his] apartments." Zeman argues that fraud can be based on a present promise to perform a future act if, when he makes the promise, the promisor has no intention of performing. However, the record does not show that Lufthansa had no intention of performing on January 9, the date the oral contract allegedly was formed.

■■■ The heart of Zeman's fraud claim centers around Lufthansa's alleged reckless indifference to his interests. A promise made without care whether it will be kept, or one the promisor knows or should know will induce detrimental reliance by the promisee, can constitute reckless indifference. *Markov v. ABC Transfer & Storage*, 76 Wash.2d 388, 457 P.2d 535, 539 (1969). Lufthansa subjectively believed it had not made a promise, but thought all along it was negotiating with several people, including Zeman. Therefore, there is no evidence that Lufthansa made a promise without care whether it would be kept. Lufthansa did sign a letter of intent with Anchor Arms on March 16, 1979, without disclosing this fact to Zeman. But on two occasions just prior to Lufthansa's agreement with Anchor Arms, Zeman had asked for written confirmation of Lufthansa's intent to lease from him, and Lufthansa refused to provide such a document. The refusal to commit in writing would not necessarily undermine the existence of an oral contract already entered into by the parties; the refusal does, however, indicate the absence of reckless indifference to Zeman's interests. Had Lufthansa left Zeman dangling without any sort of response, its silence might have risen to the level of reckless indifference, but the record shows Lufthansa made attempts to remain noncommittal.

We affirm the summary judgment as to the fraud claim.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## VI. ISSUES OF FACT RE: PUNITIVE DAMAGES.

▮▮▮▮▮ The trial judge found no evidence supporting a claim for punitive damages and dismissed the claim. Punitive damages can be recovered in an action for breach of contract "if the conduct constituting the breach is also a tort for which punitive damages are recoverable." *McKibben v. Mohawk Oil*, 667 P.2d 1223, 1232 (Alaska 1983). To support an award of punitive damages, the conduct must be outrageous; malicious acts, or acts done with reckless indifference to the interests of another constitute outrageous conduct. *Alaska Northern Development v. Alyeska Pipeline Service*, 666 P.2d 33, 41 (Alaska 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 706, 79 L.Ed.2d 170 (1984).

▮▮▮ Assuming without deciding that Lufthansa's conduct was tortious, there is no evidence of malicious conduct in this record. Additionally, the previous discussion regarding fraud also forecloses finding reckless indifference to support an award of punitive damages. There is simply no evidence giving rise to an inference of conduct sufficiently outrageous to be deemed the equivalent of actual malice. Because there is no such evidence, we affirm the grant of summary judgment as to Zeman's claim for punitive damages.

AFFIRMED in part; REVERSED in part and REMANDED.