Thomas R. WICKWIRE, Appellant/Cross-Appellee,

v.

ARCTIC CIRCLE AIR SERVICES, Appellee/Cross-Appellant.

Nos. S-826, S-873.

Supreme Court of Alaska.

July 18, 1986.

Dennis E. McKelvie, Fairbanks, for appellant/cross-appellee.

Richard G. Haggart, Birch, Horton, Bittner, Pestinger & Anderson, Anchorage, for appellee/cross-appellant.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

During the summer of 1982, Thomas Wickwire crash-landed his plane when it ran out of gas about ten miles from Fairbanks. He brought suit against Arctic Circle Air Services, claiming they were negligent in returning the plane to him with leaking fuel caps. Superior Court Judge James Blair directed a verdict against Wickwire, and awarded $12,000 for attorney fees to Arctic Circle. Wickwire appeals, arguing that a directed verdict is improper and that the attorney fees award is excessive. Arctic Circle cross-appeals, claiming that actual attorney fees of $22,594 are appropriate because the lawsuit was frivolous. We affirm the decision of the superior court as to both the directed verdict and the award of attorney fees.

## FACTS AND PROCEEDINGS

Wickwire purchased a used Cessna 185 airplane in 1977. In 1981 he leased it to Arctic Circle. The terms of this lease are found in a written agreement dated November 30, 1981. This agreement provided that Arctic Circle would supply the necessary fuel and be responsible for changing the oil every 50 flight hours. Wickwire, on the other hand, would perform or contract to perform all other required maintenance.

In March of 1982, while Arctic Circle still had possession of the plane, the time came to perform a mandatory 100–hour inspection. Wickwire contracted with Arctic Circle to do the work, and the inspection was completed on March 27, 1982. Shortly thereafter the plane was returned to Wickwire, who used it for 11.8 hours between March 27 and April 17. Wickwire then delivered his plane back to Arctic Circle with the understanding that the same terms as those in the original lease would be in effect. Arctic Circle had possession of the plane for about a month and a half, and returned it to Wickwire on June 5, 1982.

Wickwire flew the plane on several trips for a total of 15.1 hours before crash-landing near Fairbanks on June 23, 1982. These 15.1 hours were accumulated on flights between Fairbanks, Unalakleet, St. Michael, Emmonak and St. Mary's. Except for the final flight, Wickwire did not notice any unusual fuel consumption during the 15.1 hours he flew his plane. However, in hindsight he now remembers being suspicious of the fuel consumption on one flight, but that the circumstances were not such as to justify any investigation at that time.

Before taking off on the final flight from Emmonak to Fairbanks, Wickwire completely filled the right side 42 gallon gas tank by adding 17 gallons to it. To avoid the extra weight of unnecessary fuel, he did not add gas to the left tank because the gas gauge indicated that it was already three-quarters full. Wickwire took off at 2:30 in the morning, believing that he had enough gas for the three hour 45 minute flight to Fairbanks. The plane carried passenger Gary Foster and 750 pounds of fresh Lower Yukon king salmon. To keep the fish cold, they flew at over 10,000 feet with the heat off and the vents open.

At some point between 80 and 100 nautical miles outside of Fairbanks, the gauges

indicated that both tanks were less than one-quarter full. Wickwire remembered thinking at the time that even when the gauges read empty, there should still be 18 usable gallons left in the tanks. At the time he did not think the gauges were going down any faster than normal, but now, in hindsight, he thinks they were.

About ten miles out of Fairbanks the engine quit. Wickwire attempted to glide the plane toward a gravel bar in the Tanana River. In the meantime he attempted to restart the engine, but the best he could do was to get a couple of cylinders to fire for an instant. He did not try to use the emergency fuel pump.

At 6:15 in the morning, Wickwire crash-landed in the mud of the Tanana River. The plane flipped over and skidded upside down for about 40 feet. Foster struck his head when, apparently not realizing he was upside down, he unfastened his harness and fell out of the seat. Miraculously there were no other injuries. The plane, however, suffered substantial damage. After waiting several hours, the two men were sighted by passing aircraft and eventually rescued by an Army helicopter. A few days later the plane was retrieved by helicopter and brought to Chena Marina in Fairbanks.

Ten months after the crash-landing, Wickwire concluded that the plane had run out of fuel because of fuel leakage. He formed this opinion after discovering fuel leaks in the repaired and rebuilt airplane. Specifically, he and his mechanic observed obvious leakage from the fuel tank caps, and also noticed a significant improvement in fuel consumption once the four fuel caps and corresponding O-ring seals were replaced.

Wickwire filed suit against Arctic Circle, claiming that they were negligent in returning the plane to him with leaking fuel caps.[1]

## DIRECTED VERDICT

Wickwire's theory at trial was that the fuel caps were leaking while Arctic Circle had the plane, and therefore they were negligent in not discovering the leakage and correcting the problem before returning it. To make out a prima facie case of negligence, Wickwire needed to present evidence on each of the following elements: duty, breach of that duty, proximate cause and damages. The trial judge directed a verdict against Wickwire because he believed (1) neither Wickwire nor his expert witness could show that the plane was leaking gas at the time Arctic Circle had possession of the plane, and (2) even assuming it was leaking during Arctic Circle's possession, there was no evidence that this leakage could have been discovered by a reasonable inspection. The trial judge reasoned that there can be no breach of a duty to correct the leakage problem unless there was in fact a leakage problem and Arctic Circle knew of or reasonably should have discovered the leakage. In other words, the trial judge ruled, as a matter of law, that Wickwire was unable to show how Arctic Circle breached a duty of care owed to him. Because we agree that Wickwire presented no evidence indicating that Arctic Circle knew of or reasonably should have discovered the fuel leakage, we affirm the directed verdict against Wickwire.

In *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216 (Alaska 1978), this court defined the standard of review regarding a motion for directed verdict.

"[T]he proper role of this court, on review of motions for directed verdict ... is not to weigh conflicting evidence or judge the credibility of the witnesses, but is rather to determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable men could not differ in their judgment." The test is objective; and, if there is room for diversity of opinion among reasonable people, the

1. The complaint also alleged that Arctic Circle had failed to return Wickwire's engine and windshield cover, but this claim for conversion was dismissed without prejudice after agreement by the parties.

question is one for the jury. Further, all favorable inferences are to be accorded the non-moving party.

*Id.* at 220 (quoting *Holiday Inns of America, Inc. v. Peck,* 520 P.2d 87, 92 (Alaska 1974)) (footnotes omitted).

Taken in the light most favorable to Wickwire, there is evidence that shortly before the crash the fuel cap 0–rings had gradually worn to the point where they allowed significant amounts of fuel to be siphoned out by low pressure over the top of the wings during flight. Furthermore, there is evidence that fuel lost in this manner was the primary cause of the crash. However, and notwithstanding the fact that one fuel cap visibly leaked fuel after the damaged plane was rebuilt nine months later, there is no evidence that the leakage problem had advanced to this degree at any time before the final ill-fated flight. Rather, and viewed in the light most favorable to Wickwire, the 0–rings had gradually deteriorated to a point where they allowed significant fuel loss during flight but otherwise presented no visible clue as to the existence of a problem. Neither visible inspection of the 0–rings themselves, nor a search for gas stains around the fuel caps would have indicated any fuel leakage. Short of resorting to some type of static pressure test, the only sign of worn 0–rings was gradually increasing fuel consumption.

Even assuming that this incipient leakage had already begun while Arctic Circle was in possession of the plane, there is absolutely no evidence that Arctic Circle had actual notice of any problem with the fuel caps. Perhaps realizing his inability to demonstrate actual knowledge on the part of Arctic Circle, Wickwire instead made a determined effort to show that Arctic Circle reasonably should have discovered the leakage during their performance of the 100–hour inspection.

Wickwire offered his mechanic, Charles Adams, as an expert witness. Adams and Wickwire had discovered a leaking fuel cap while reassembling the plane nine months after the crash-landing. Adams described the fuel leak as follows: "It was obvious, yes because it [fuel] was running back over the top of the wing and dripping off the flap." Adams later testified that Arctic Circle should have noticed and corrected the problem if the plane were leaking in this same obvious manner during the 100–hour inspection. While it is true that it would probably be negligent for an airplane mechanic to overlook gas flowing onto the wing and dripping to the ground during a 100–hour inspection, there was no evidence that the plane was in this condition while Arctic Circle had possession of it. In fact, the first time anyone ever noticed visible fuel leakage was during the reassembly stage nine months after the crash-landing. The only indication of fuel leakage before the accident was Wickwire's testimony concerning abnormal fuel consumption. Therefore Adams' expert opinion that it is unreasonable for an airplane mechanic to overlook visible fuel leakage during an inspection is simply irrelevant as there was no evidence of visible fuel leakage during Arctic Circle's possession of the plane.

Adams also testified about various procedures that, although not required by any regulation, could nevertheless be employed by a careful airplane mechanic to possibly detect worn 0–rings. For example, Adams testified about an Owner Advisory and Service Letter that described a method in which a soap and water solution is placed around the fuel caps and pressure applied to the tanks in hopes that soap bubbles will indicate the presence of any leakage. However, since the soap bubble procedure was not published until several months after the inspection in issue was completed, there is no indication that Arctic Circle reasonably should have detected the leak in this manner.

Adams also described a procedure he and his co-workers at Aurora Air Service had developed in which the fuel tanks are filled and the plane tilted with a jack to see if the caps still seal as the fuel flows against them. They got the idea for this tilt-test from the manufacturer's recommended pro-

cedure for checking vent fittings and other items on the outboard ends of the fuel tanks. There was no testimony, however, that it would be unreasonable during a 100–hour inspection not to employ this procedure to test fuel caps. . Furthermore, there was no evidence that at the time of the 100–hour inspection, the incipient leak had progressed to the point where it would have failed this test.

Adams further testified about a Cessna factory issued Service Letter that recommended fuel caps be cleaned and inspected on an as-required basis. However, it appears that leakage problems cannot always be detected by routine visual inspection. Adams, Wickwire's own expert, visually inspected and actually reinstalled the same fuel caps and 0–rings that were later responsible for the post-crash incident involving large amounts of fuel dripping off the wing. As Adams testified during cross-examination:

Q And you reached a professional opinion as to the condition of those 0–rings, is that correct? That they were adequate—visually adequate—to reinstall in the aircraft?

A Yes.

Q And then you subsequently found that one of the four was pouring out fuel?

A Yes.

Q But there was nothing about their appearance that clued you that you should replace one, two, three, or all four of those 0–rings, that they would begin failing tomorrow, in a month, in three months, is that correct?

A That's correct.

By offering testimony concerning various procedures that a mechanic could use to possibly detect leaking fuel caps, Wickwire obviously hoped the jury would assume that Arctic Circle neglected to inspect the fuel caps and 0–rings for signs of leakage. This, of course, would require the jury to assume facts not in evidence. Without any evidence as to what Arctic Circle actually did or did not do during the 100–hour inspection, we fail to see how expert testimony concerning methods for testing fuel caps can have any impact on the issue of whether Arctic Circle should have detected the leakage during that inspection. For all we know, Arctic Circle may have reasonably and carefully examined and tested the fuel caps yet found no indication of worn 0–rings. To make out a prima facie case of negligence, a litigant must present evidence, not speculation.[2]

Finally, Adams attempted to testify about another airplane with leaking fuel caps that belonged to the same Arctic Circle mechanic who inspected Wickwire's plane. There was an objection, and the jury took a recess while the trial court heard an offer of proof.[3] Although not raised in the points on appeal, both parties briefed the evidentiary question concerning this other airplane. It is sufficient to note that evidence of negligence in inspecting one plane is not admissible as proof of negligence in inspecting another plane. Alaska R. Evid. 404(b).

In sum, there was absolutely no evidence that Arctic Circle breached a duty of care owed to Wickwire. There is nothing in the record to indicate that Arctic Circle actually knew of or reasonably should have discovered the worn 0–rings either during the 100–hour inspection or at any other time during their possession of the plane. Wickwire was given ample warning by the trial court that a verdict would be directed against him if he did not introduce sufficient evidence to make out a prima facie negligence case. Wickwire's attorney acknowledged that the only two witnesses he

---

**2.** In his brief, Wickwire attempts to sidestep this lack of evidence problem by shifting the focus from negligence to strict liability. Because the strict liability theory was not presented below we need not consider it here. *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985).

**3.** From this discussion emerged the motion for a directed verdict which the trial court eventually granted.

could offer to testify on the negligence issue were Wickwire and Adams. In our view neither Wickwire nor Adams offered sufficient testimony as to Arctic Circle's alleged negligence to justify giving the question to the jury. The trial court therefore acted properly in directing a verdict on the negligence claim.

## ATTORNEY FEES

The issue here is whether the $12,000 award is so manifestly unreasonable as to constitute an abuse of the trial court's wide discretion in awarding fees to a prevailing party under Civil Rule 82. *Gold Bondholders Protective Council v. Atchison, Topeka & Santa Fe Railway Co.*, 658 P.2d 776, 778 (Alaska 1983).

Wickwire argues that the trial court abused its discretion because (1) the award is excessive and (2) the court failed to state its reasons on the record. Arctic Circle, by cross-appeal, claims that actual attorney fees of $22,594 are appropriate because the lawsuit was frivolous.

Although Wickwire's case was weak, this does not necessarily imply vexatious or bad faith conduct. The trial court therefore did not abuse its discretion in awarding $12,000 instead of the $22,594 actually incurred. *Mullen v. Christiansen*, 642 P.2d 1345, 1351 (Alaska 1982). Furthermore, deference should be given to the trial judge; he was present during the trial and as such was in the best position to determine whether an award of full attorney fees is justified by any vexatious or bad faith conduct that may have occurred.

Likewise, we also reject the argument that the fees are excessive. The award of $12,000 is not so manifestly unreasonable as to constitute an abuse of discretion.

Finally, Wickwire's argument that the trial court must state its reasons on the record is without merit. True, if a money judgment is recovered, "[t]he court must either state its reasons for making an award that varies from the schedule set forth in Civil Rule 82(a) or adhere to that schedule." *Mullen*, 642 P.2d at 1351. However, since there was no money judgment in this case, the schedule in Rule 82(a)(1) does not apply. The last sentence in 82(a)(1) provides, "Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court in its discretion in a reasonable amount." Common sense dictates that the trial court need not explain why it is departing from the Rule 82 schedule in a case where the schedule does not apply.[4]

The only other situation in which the trial court must state the basis for its decision is where the court does not award *any* attorney fees to the prevailing party. *Stordahl v. Government Employees Insurance Co.*, 564 P.2d 63, 68 (Alaska 1977). Here, however, the trial court awarded $12,000 to the prevailing party, Arctic Circle. There was no abuse of discretion by the trial court in failing to state reasons for its decision on attorney fees.

## CONCLUSION

The directed verdict against Wickwire is supported by the record. In addition, the $12,000 award of attorney fees is not so manifestly unreasonable as to be an abuse of discretion.

AFFIRMED.

---

4. Furthermore, even in a case where the schedule does apply, the trial court need not expressly set forth its reasons for deviating from that schedule if those reasons appear obvious to this court. *Board of Ed., Fairbanks N. Star Bor. Sch. Dist. v. Ewig*, 609 P.2d 10, 15 (Alaska 1980).