**LEXINGTON INSURANCE COMPANY, a Delaware corporation, Westchester Fire Insurance Company, a New York corporation, Agricultural Insurance Company, a Delaware corporation, The Travelers Indemnity Company of Illinois, an Illinois corporation, and Fireman's Fund Insurance Company, a California corporation, Appellants,**

v.

**LINDAHL CONSTRUCTION AND ENGINEERING, INC., an Alaska corporation, Steven M. Lindahl, an individual, and the State of Alaska, Appellees.**

No. S–9701.

Supreme Court of Alaska.

May 24, 2002.

---

William Grant Callow, Law Offices of William Grant Callow, P.C., Anchorage, and Paul V. Esposito, Clausen Miller, P.C., Chicago, Illinois, for Appellants.

Steven M. Lindahl, pro se, Holmes Beach, Florida.

Randy M. Olsen, Assistant Attorney General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellee State of Alaska.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

### OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

Fire damaged the Denali Princess Lodge in 1996. Five insurance companies paid the lodge owner under policies covering property and business interruption loss. The insurance companies then sued the State of Alaska, claiming that it negligently approved building plans which did not satisfy the 1979 Uniform Building Code (UBC) and negligently failed to require a one-hour fire-resistive enclosure around a lodge furnace. They also sued the contractor that built the lodge, claiming that it negligently failed to follow the building code. The superior court granted summary judgment to the defendants, holding that the 1985 UBC applied and that

it did not require a one-hour fire wall around the furnace. We affirm, because there are no genuine issues of material fact and the defendants were entitled to judgment as a matter of law.

## II. FACTS AND PROCEEDINGS

In 1986 Princess Tours hired Lindahl Construction and Engineering, Inc., as the general contractor for its new hotel complex near Denali National Park. Jerry Moberg, Princess's project engineer, began discussing the project and code requirements with a state deputy fire marshal, Charles Lee Davis, in May 1986. At the time of those early conversations the 1979 Uniform Building Code was still in effect in Alaska. It was not until August 2, 1986 that the 1985 UBC became effective in Alaska.[1] On July 31, 1986 Princess submitted its application for plan review to the state's Department of Public Safety, Fire Marshal's Office, and paid the fees for the review. It did not submit the project plans with the application. On the same day Lindahl and Moberg met with another state deputy fire marshal, Ernest Misewicz, to discuss the project. Lindahl wrote a letter to Misewicz confirming the discussion: "To confirm the topics discussed in your office on 7/31/86, I have enclosed a list of items that were discussed for your records...." The letter listed several items of discussion, including "13. The entire project will be reviewed under the 1979 U.B.C. codes." Lindahl testified in his deposition that he believed this statement was a request by Princess to have the project reviewed under the 1979 UBC, and that it did not reflect an affirmative answer by the state to apply the 1979 UBC.

On August 12, 1986 Deputy Fire Marshal Davis spoke with Moberg by telephone. Davis asked Moberg what version of the UBC Princess was using to formulate its plans. Davis told Moberg that if Princess wanted the state to apply the 1979 UBC to the project, Princess needed to submit a letter requesting application of the 1979 UBC. Although the state received on August 15, 1986 Lindahl's letter recounting the

---

1. 13 Alaska Administrative Code (AAC) 50.020 (1986).

July 31 meeting between Lindahl, Moberg, and Misewicz, the supervisor of the State Fire Marshal's Office later stated in an affidavit that the state did not receive any other writing representing Princess's desire to have the building plans reviewed under the 1979 UBC.

The building plans divided the hotel into four buildings: Building 1 contained hotel rooms, a lobby, a gift shop, and offices; Building 2 contained hotel rooms; Building 3 contained the restaurant; and Building 4 housed employees. Building 4 was separate from the others and was the only building to survive the fire.

By letter of September 11, 1986 Deputy Fire Marshal Misewicz authorized Lindahl to begin foundation work for Buildings 1 and 2, but forbade further work until complete plans for the project were received and approved. The letter warned that the distance between Building 1 and Building 3 was insufficient to meet the standards set out in the 1985 UBC. Princess did not communicate any objection to this application of the 1985 UBC to the lodge project. Misewicz reviewed the plans for Buildings 1 and 2 on September 23 under the 1985 UBC and classified Buildings 1 and 2 as "Occupancy: R–1." He issued a certificate of plan review on September 29. On October 22, 1986 Lindahl wrote Misewicz regarding the classification of the lobby and reception area in Building 1. By letter of October 23, 1986 Misewicz replied, stating that the "lobby/reception area/foyer" of Building 1 was "considered one area" and that "[t]he 1985 Uniform Building Code classifies this area as an Assembly 3(A3) [o]ccupancy." Princess did not object to this classification.

In March 1996 fire destroyed three of the Denali Princess Lodge buildings. As a result of the fire Lexington Insurance Company and four other insurance companies (collectively "Lexington") paid Princess Tours more than $18,000,000. The state fire inspector concluded that the fire started at the furnace in the crawlspace of Building 1.

In March 1998 Lexington filed a superior court complaint that alleged, among other things, that Lindahl Construction and Engineering, Inc., breached its general construction contract with Princess Tours by failing to comply with the owner-approved plans and specifications, and by failing to comply with all applicable building and fire codes, including the requirement of a one-hour fire wall around the furnace where the fire allegedly started. The complaint also alleged that Lindahl Construction and Steven Lindahl individually failed to exercise due care in constructing the four buildings, causing the fire to spread from the crawlspace under Building 1 to Buildings 2 and 3. Finally, the complaint alleged that the State of Alaska failed to exercise due care in reviewing the plans submitted by Lindahl Construction for Building 1 because the plans contained no provision for a one-hour fire wall around the furnace where the fire allegedly started.

In September 1999 the state moved for summary judgment; it argued that the 1985 UBC was the applicable building code and that the 1985 UBC did not require fire walls around the furnaces in the Princess Lodge because the furnaces were located in an assembly area (A–3) or a business area (B–2). In September 1999 Lindahl, representing both his construction company and himself pro se, moved for summary judgment. He also argued that fire walls were not required under the 1985 UBC for the lobby area of Building 1. He then adopted the state's similar motion, and the state adopted Lindahl's motion.

Lexington argued in its opposition to the summary judgment motions that the 1979 UBC applied to the Denali Princess Lodge project because the application for plan review was submitted to the Fire Marshal's Office on July 31, 1986, two days before the 1985 UBC took effect, and because Deputy Fire Marshal Misewicz had agreed to apply the 1979 UBC. Lexington also argued that the furnace was located in an R–1 area and that the 1979 and 1985 UBC both required one-hour fire walls around furnaces in that area. The state argued in response that Misewicz did not err in reviewing the Building 1 plans under the 1985 UBC and that "[t]he 1985 UBC was the proper code to govern the construction of Building 1."

The superior court granted summary judgment in April 2000 to the state, Lindahl Construction, and Steven Lindahl individually. It concluded that as a matter of law the 1985 UBC applied to the Denali Princess Lodge project. It also held that the state's A–3 classification of the lobby area was not legally infirm or an abuse of discretion, and that the state was not negligent in failing to require a one-hour fire wall because the 1985 UBC did not require a fire wall for furnaces built in A–3 areas.

The state moved for attorney's fees. Lexington opposed, claiming that the state's attorneys had devoted twice as much time to the case as Lexington's attorneys. The state replied that Lexington's comparison of its hours spent on the case with the state's was faulty because much of Lexington's legal work would have been done before Lexington filed suit. The state also filed a motion to require Lexington to disclose the total time spent on the case from the time of the fire. Without deciding this last motion, the superior court entered final judgment for all defendants and awarded the state $54,471.12 for attorney's fees and paralegal fees.

Lexington appeals the grant of summary judgment to the defendants and the award of attorney's fees.

## III. DISCUSSION

### A. Standard of Review

We review the dismissal of Lexington's claims on summary judgment de novo.[2] A summary judgment movant must establish that there "are no genuine issues of material fact and that it is entitled to judgment as a matter of law."[3] We will draw all reasonable factual inferences in favor of Lexington, the nonmoving party.[4] Summary judgment is inappropriate if "the parties genuinely dispute any facts material to a viable legal theory."[5] We apply our independent judgment to questions of law, adopting " 'the rule of law that is most persuasive in light of precedent, reason, and policy.' "[6]

We review an award of Alaska Civil Rule 82 attorney's fees for an abuse of discretion.[7]

### B. The Superior Court Did Not Err in Concluding that the 1985 UBC Applied to Building 1.

#### 1. No factual dispute about whether the state was required to review the Denali Princess Lodge building plans under the 1979 UBC is material.

Lexington argues that there is a genuine issue of material fact whether Lexington and the state agreed that the 1979 UBC would govern the Denali Princess Lodge project. In making this argument Lexington relies in part on the July 31, 1986 letter to Deputy Fire Marshal Misewicz in which Lindahl writes: "The entire project will be reviewed under the 1979 U.B.C. codes." The state argues that the letter was only a recitation of discussion topics and not an agreement to apply the 1979 UBC to the project. The state also claims that once Princess received oral advice that the 1985 UBC was already in effect and would control, Princess offered no objections to the application of the later code. The supervisor of the State Fire Marshal's Office provided an affidavit stating that after Moberg and Davis spoke on August 12, 1986, Princess made no written requests that the plans be reviewed under the 1979 UBC.

The grant of summary judgment to the state must be overturned if we determine that any genuine factual disputes are materi-

**2.** *Reeves v. Alyeska Pipeline Serv. Co.*, 926 P.2d 1130, 1134 (Alaska 1996).

**3.** *Id.* (citing *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985)).

**4.** *Id.* (citations omitted).

**5.** *McGlothlin v. Municipality of Anchorage*, 991 P.2d 1273, 1277 (Alaska 1999) (citations omitted).

**6.** *Bockness v. Brown Jug, Inc.*, 980 P.2d 462, 465 (Alaska 1999).

**7.** *Caudle v. Mendel*, 994 P.2d 372, 374 (Alaska 1999).

al.[8] Viewed in a light most favorable to Lexington, there may be a factual dispute about the significance of Lindahl's July 31, 1986 letter to the state. But Lexington's complaint alleged a negligence cause of action against the state based on the state's review and approval of the building plans and the state's subsequent fire safety inspections. Lexington reiterated its negligence claim in its opposition to the state's motion for summary judgment; Lexington stated that "[o]ne of the reasons [Lexington] claim[s] [the state] was negligent in this case is because Mr. Misewicz reviewed this project under the wrong edition of the Uniform Building Code at the time he did his building plans review." Lindahl's letter may indicate that it was contemplated or even expected during initial discussions between Lindahl, Moberg, and Misewicz that the 1979 UBC would apply. But as a matter of law it was the 1985 UBC that was in effect when Misewicz actually reviewed the plans in late September 1986.

Lexington's cause of action necessarily assumes that the state breached the applicable standard of care by failing to apply the 1979 UBC and by classifying the commercial area as A–3 rather than R–1.[9] At the time of his plans review in September, however, Deputy Fire Marshal Misewicz had no legal obligation or authority to apply the 1979 UBC because the 1985 UBC was already in effect. It was the 1985 UBC, along with the classification of the commercial area, that governed Lexington's negligence claim.[10] Perhaps if Lexington had asserted a negligent misrepresentation claim or a contract claim, the state's earlier alleged agreement to apply the 1979 UBC, and its initial characterization of the commercial area as R–1, would have raised a genuine, material factual dispute. But because Lexington actually asserted only

a negligence claim, its claim turns on whether the state breached a duty at the time it approved the plans; pre-approval events are of no consequence. Since Deputy Fire Marshal Misewicz's application of the 1985 UBC after it became effective did not breach the negligence standard of care, we do not need to decide whether he arguably could have been required to apply the 1979 UBC by agreement with Princess or otherwise.

Although we need not examine whether there is a genuine issue of material fact about whether the parties agreed to apply the 1979 UBC, we note that basic contract principles cast serious doubt on Lexington's claim that the state entered into a legally binding agreement to apply the earlier UBC. Lexington cites *Bloomstrand v. State*[11] for the proposition that silence may be deemed an admission when a silent person could be reasonably expected to speak. That case involved constitutional and criminal law issues related to a defendant's right to remain silent in a homicide investigation;[12] it is of no relevance here.

 Instead, it is instructive to consider Lexington's claim of an alleged agreement with the state in a contractual environment. We have previously held in the context of summary judgment that to demonstrate the existence of a contract or legally binding agreement, a party must point to evidence showing that the opposing party "unequivocally accepted an offer by words and actions that objectively manifested an intent to be bound."[13] Without this showing we will not disturb the summary judgment.[14] We have also held that silence operates as acceptance of an agreement only in cases where a party has " 'reason to understand that assent may be manifested by silence . . ., and the [party] in remaining silent . . . intends to accept the

---

**8.** *McGlothlin*, 991 P.2d at 1277.

**9.** The premise of Lexington's claim is that the state owes owners a duty, enforceable in tort, to advise them of their noncompliance with applicable building code provisions. In view of our decision in this case we have no occasion to endorse or reject this premise.

**10.** *See infra* Part III.B.2 for a discussion of the classification of Building 1.

**11.** 656 P.2d 584, 588 (Alaska App.1982).

**12.** *Id.* at 587–89.

**13.** *Brady v. State*, 965 P.2d 1, 8 (Alaska 1998) (citations omitted).

**14.** *Id.*

offer.' " [15] The state's silence upon receiving Lindahl's July 31, 1986 letter does not demonstrate the type of clear knowledge of an agreement required to bind the state. Also, Lexington does not make a sufficient showing through the state's actions or written or spoken words that the state assented to an agreement that would potentially subject it to the type of liability Lexington now alleges.

Lexington further argues that Deputy Fire Marshal Misewicz's August 20, 1986 letter to Lindahl seeking clarification of work relating to Building 4 evinced the state's intent to enter into an agreement to apply the 1979 UBC to the entire project. The state claims that "[t]he employee housing building [Building 4] ... had already been started [and] was being constructed according to the 1979 UBC." Accordingly, it would not be surprising that the August 20 letter referred to the 1979 UBC. In any event, the state's letter was addressed to Lindahl and did not create any contractual obligation with Princess.

For the reasons discussed above, any dispute regarding the alleged agreement to use the 1979 UBC is not material to Lexington's negligence claim. We consequently hold that the superior court did not err by granting summary judgment to the state.

### 2. The vested rights approach to determining which building code applied to Building 1 does not apply here.

■ Lexington asks us to adopt the vested rights approach for determining whether the 1979 UBC or the 1985 UBC was the appropriate building code for the state's review of the Denali Princess Lodge project. It asserts that under the vested rights approach, a property owner has a right to

application of the building code that is in effect when the owner applies for plan review.[16] Lexington argues that we should adopt this rule in Alaska because it produces a bright line test that is easy to administer. Although it would be a matter of first impression for this court, we do not need to decide here whether to adopt this approach for Alaska. The vested rights approach is the minority rule in other jurisdictions. It requires not merely an application by the owner, but a substantial change in position in reliance on the old law.[17] Lexington does not argue that Princess changed its behavior in reliance on any expectation that the state would apply the 1979 UBC. Princess remained free to build the lodge to standards exceeding the requirements of the 1985 UBC, and the state did not prevent Princess from building a fire wall around the furnace. Because Lexington would not prevail even if we applied the vested rights approach, there is no reason for us to decide whether to adopt it for Alaska.

### C. The Superior Court Did Not Err in Holding that the Fire Marshal Correctly Classified the Lobby as an Assembly–3 Area.

■ Lexington argues that even if the 1985 UBC applied, a one-hour fire wall was still required. The 1979 UBC and the 1985 UBC both state that "[e]very room containing a boiler, central heating plant or hot-water supply boiler in Division 1 Occupancies [which include areas characterized as R–1] shall be separated from the rest of the building by not less than a one-hour fire-resistive occupancy separation."[18] Lexington therefore reasons that because Deputy Fire Marshal Misewicz classified the lobby area of

**15.** *Id.* at 9 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 69 (1979)). *See also* 1 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 3.18, at 402–07, § 3.21, at 414 (1993) (silence as acceptance usually limited to cases where conduct of party denying contract or agreement would lead other to reasonably believe that silence would be sufficient, such as where party "is so certain that the [other] will accept that the [other's] silence will be taken as acceptance").

**16.** Lexington cites *State ex rel. Ogden v. City of Bellevue,* 45 Wash.2d 492, 275 P.2d 899, 901–02 (1954), in support. *Ogden* involved a zoning

ordinance and not a building code. We do not consider how the vested rights approach might apply in the context of building codes because Lexington's argument fails even if there is no difference in the legal applicability of the rule in the two separate contexts.

**17.** *Relay Improvement Ass'n v. Sycamore Realty Co.,* 105 Md.App. 701, 661 A.2d 182, 188–89 (1995).

**18.** UBC §§ 1201, 1212 (1979, 1985).

Building 1 as R–1 in his September 1986 plan review, the one-hour fire wall was necessary since both versions of the UBC required it.

The state argues that Deputy Fire Marshal Misewicz's October 23, 1986 letter to Lindahl stating that "[t]he 1985 Uniform Building Code classifies this area as an Assembly 3(A3) occupancy" was sufficient to classify the area as A–3 and not R–1. It argues that Misewicz's classification of the area as A–3 was bolstered by the opinions of other professional engineers and architects. Also, the state notes that fire inspections of the premises in subsequent years classified the area as A–3 or B–2, confirming that Misewicz's classification of the area as A–3 was not in error.

To prevail on its negligence claim against the state, Lexington must demonstrate that the state breached some duty owed to Lexington—that it misinterpreted or misapplied the law.[19] The superior court correctly noted that it is a question of law whether the occupancy classification assigned to the lobby was correct. Section 501 of the UBC gave the fire marshal the authority to classify Building 1.[20] Misewicz classified the lobby as A–3 in his October 23, 1986 letter. Although Lexington continues to maintain that there is a genuine issue of material fact about the lobby's proper classification, Lexington has offered no evidence that the lobby should have been classified as R–1 or that it was incorrectly classified in the October 23, 1986 letter or during state inspections in subsequent years.

Lexington argues that the state, by first assigning the R–1 classification to Building 1 during the initial review, was not permitted to adjust its classification in light of additional information about the building. Lexington's interpretation defies the clear words of both editions of the UBC, which state that "any question [regarding occupancy] shall be classified by the building official."[21] Lexington does not argue that Misewicz's classification of the lobby as A–3 was itself incorrect, and neither code prohibits such a classification.[22] Lexington only argues that Misewicz's first review classified the lobby as R–1 and that his later classification of the lobby as A–3 was impermissible. Further, if Lexington's argument were the law, it would impose an undue burden on the review of building plans and inspection of buildings by state officials. Because section 501 of the 1985 UBC clearly gave the fire marshal the authority to classify the lobby in Building 1, we hold that the state's original classification of the lobby as R–1 does not create a genuine issue of material fact, especially in light of Misewicz's October 23, 1986 classification of the area as A–3.

**D. The Superior Court Did Not Abuse Its Discretion in Awarding Attorney's Fees to the State.**

 Applying the twenty percent standard for cases resolved without trial,[23] the superior court awarded the state Civil Rule 82 fees of $54,471.12. The award was twenty percent of $272,355.58, the value the state attributed to the services of Department of Law attorneys and paralegals.

Lexington argues that this award was excessive. It reasons that the hours the state claims it spent—1,446.4 hours by its attorneys and 767.6 hours by its paralegals—greatly exceeded the 694 hours Lexington's attorneys spent during the same period. Lexington does not separately attempt to

---

19. *Wickwire v. Arctic Circle Air Servs.*, 722 P.2d 930, 932 (Alaska 1986) ("To make out a prima facie case of negligence, Wickwire needed to present evidence on each of the following elements: duty, breach of that duty, proximate cause and damages."); *contra Mesiar v. Heckman*, 964 P.2d 445, 452 (Alaska 1998) ("Heckman cites no cases, and we are aware of none, holding that mere negligence by an agency charged with a general public duty of resource management supports a claim for damages by an affected resource user.").

20. Section 501 of both the 1979 UBC and the 1985 UBC states that "[a]ny occupancy ... about which there is any question shall be classified by the building official." UBC § 501 (1979, 1985).

21. UBC § 501 (1979, 1985).

22. *Id.*

23. Alaska R. Civ. P. 82(b)(2) (providing that the court "shall award the prevailing party in a case resolved without trial 20 percent of its actual attorney's fees which were necessarily incurred").

show that it was error to award paralegal fees. The state argues that the time its attorneys spent was not excessive, and that a fair comparison would require Lexington's attorneys to document the total time they spent on the litigation, including time they spent before they filed the complaint.

Lexington does not challenge any specific part of the 1,446.4 hours of attorney time reported by the state, but argues only that the total was excessive. An award of attorney's fees under Civil Rule 82 will be reversed "only upon a showing of abuse of discretion or a showing that the award [was] manifestly unreasonable."[24] Because Lexington has not demonstrated that the amount awarded was excessive, that the twenty percent standard was the incorrect standard, or that the state's attorneys' hours were excessive, we hold that the superior court did not abuse its discretion in awarding attorney's fees to the state.

Finally, Lindahl seeks an award of attorney's fees from Lexington. Because he is a pro se litigant, Lindahl is not entitled to attorney's fees.[25]

## IV. CONCLUSION

We AFFIRM the superior court's grant of summary judgment in all respects and AFFIRM its award of attorney's fees.

**24.** *Feichtinger v. Conant,* 893 P.2d 1266, 1268 (Alaska 1995) (citations omitted).

**25.** *Alaska Fed. Sav. & Loan Ass'n of Juneau v. Bernhardt,* 794 P.2d 579, 581–82 (Alaska 1990).